# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ESTATE OF VIRGINIA A. BIGELOW,
DECEASED, FRANKLIN T. BIGELOW,
JR., EXECUTOR,
            *Petitioner-Appellant,*

            v.

COMMISSIONER OF INTERNAL
REVENUE,
            *Respondent-Appellee.*

No. 05-75957

Tax Ct. No.
4066-02

OPINION

Appeal from a Decision of the
United States Tax Court

Argued and Submitted
June 5, 2007—Pasadena, California

Filed September 14, 2007

Before: Sidney R. Thomas, Kim McLane Wardlaw, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

12375

**COUNSEL**

Franklin T. Bigelow, Jr., Klicka, Parrish & Bigelow, Pasadena, California, for appellant Estate of Virginia A. Bigelow.

Jonathon S. Cohen and Michael J. Haungs, United States Department of Justice, Tax Division, Washington D.C., for appellee Commissioner of Internal Revenue.

## OPINION

GOULD, Circuit Judge:

The Estate of Virginia A. Bigelow ("the Estate") appeals the decision of the United States Tax Court upholding a deficiency in the Estate's federal estate tax return imposed by appellee Commissioner of Internal Revenue ("the Commissioner"). We consider the applicability of § 2036(a) of the Internal Revenue Code, 26 U.S.C. § 2036(a), which recaptures in a decedent's gross estate the value of certain assets transferred *inter vivos*. Upon Ms. Bigelow's death, the Estate filed a federal estate tax return that applied a 37% discount for lack of control and marketability to her remaining interest in a family limited partnership that held a residential property Ms. Bigelow had transferred before her death. The Commissioner filed a notice of deficiency and assessed an additional $217,480.05 in federal estate tax, claiming that the residence's fair market value, rather than the value of the partnership shares subject to the discount, should be included in the gross estate. The Tax Court affirmed the deficiency determination, finding that Ms. Bigelow and the Bigelow children had an implied agreement that Ms. Bigelow would retain income and economic enjoyment from the transferred asset, and that the *inter vivos* transfer was not a bona fide sale for adequate and full consideration under 26 U.S.C. § 2036(a). We have jurisdiction under 26 U.S.C. § 7482(a)(1). We affirm.

## I

Virginia A. Bigelow ("decedent") died testate on August 8, 1997, at the age of eighty-eight.[1] She was survived by her son, Franklin T. Bigelow, Jr. ("Bigelow"), who is the executor of

---

[1] The facts we recite are undisputed facts, as determined by the Tax Court. *See generally Estate of Bigelow v. Comm'r*, 89 T.C.M. (CCH) 954 (2005).

the Estate, was attorney in fact pursuant to a durable power of attorney from 1986 until decedent died, and is the attorney of record for this appeal; by her daughter Virginia L. Burke ("Burke"); and by nine grandchildren.

In 1963, decedent and her husband purchased as their principal residence a beachfront house on Sand Point Road in Carpinteria, California ("the Sand Point Road property"). Decedent became the sole owner of that property in 1966 when her husband died, and lived there until 1992. Decedent gave each of her three children — Bigelow, Burke and Katharine B. Fitzgerald ("Fitzgerald") (deceased) — a 1/175th undivided interest in the Sand Point Road property in 1990 or 1991. These gifts were in keeping with decedent's practice of making cash gifts to her children every year around Christmas, each of which fell below the threshold level where gift tax liability would accrue.

## A

In 1991, decedent executed a declaration and agreement of trust ("the trust agreement") and a deed transferring her remaining 98.2857% undivided interest in the Sand Point Road property to the trust, over which she and Bigelow acted as co-trustees.

On March 9, 1992, decedent suffered a debilitating stroke. After she was released from the hospital, she moved to an assisted-living facility in Alhambra, California and never again lived at the Sand Point Road property. After the stroke, Bigelow assumed control over decedent's financial concerns and paid her bills. Aside from the principal asset of the Sand Point Road property, decedent had a personal bank account and an account held under a revocable trust left by her late husband, which together totaled about $23,047. In the fall of 1992, the trust listed the Sand Point Road property for sale. In January 1993, the trustees and decedent's children (collectively "the Bigelow children") entered into an exchange and

leaseback agreement with Peter and Margaret Seaman ("the Seamans"), who owned a residence on Padaro Lane in Carpinteria, California ("the Padaro Lane property"). Under the exchange agreement, the trust and the Bigelow children agreed to transfer to the Seamans the Sand Point Road property, appraised at $1,325,000, and the Seamans agreed to pay the Bigelows $125,000 and to transfer to the trust the Padaro Lane property valued at $1,200,000. As part of the agreement, the trust agreed to lease the Padaro Lane property to the Seamans, with a monthly rent of $3,500 under an initial term of twelve months, until the Seamans could build a new house on the Sand Point Road property. The Bigelow children also transferred their fractionalized interests to the Seamans and received $68,630 in return.

To repay the two existing mortgages on the Sand Point Road property, the trust obtained a $350,000 loan from Great Western Savings and Loan ("Great Western"), which was evidenced by a promissory note and secured by a first position deed of trust on the Padaro Lane property in favor of the bank, which included the assignment of rents as additional collateral. Decedent and Bigelow guarantied the performance of the trust under the promissory note. Decedent signed the exchange agreement and the deed transferring the Sand Point Road property to the Seamans. Bigelow signed the other documents, including the loan guaranties, for himself as trustee and for decedent under the power of attorney.

In December 1993, the trust obtained a $100,000 line of credit from Union Bank secured by a second position deed of trust on the Padaro Lane property. Decedent guarantied the performance of the trust under the line of credit. The trust drew down $100,000 on this line of credit between December 1993 and November 1994, in part to make cash gifts to decedent's children and grandchildren.

## B

In December 1994, the trust and the Bigelow children executed a limited partnership agreement ("the partnership agreement") that formed Spindrift Associates, Ltd., a California limited partnership ("Spindrift" or "the partnership"),[2] whose stated purpose was to engage in the business of owning and operating residential real property, *i.e.*, the Padaro Lane property. The partnership agreement prohibited the partnership from engaging in any other principal business. The partnership agreement permitted the partnership to issue share units with different rights and preferences. Each unit represented a contribution of cash or property of $100. "A units" were issued to limited partners for cash, while "B units" were issued to limited partners in exchange for contributions of property.

The trust was both the sole general partner and a limited partner. The Bigelow children were limited partners. In December 1994, the trust contributed $500 to the partnership in exchange for a 1% interest as general partner, and the trust and the Bigelow children each contributed $100 in exchange for one A unit. On December 22, 1994, the trust transferred the Padaro Lane property, then worth $1,450,000, to the partnership in exchange for 14,500 B units. However, the partnership provided that the transferred real property would be encumbered by the Great Western and Union Bank debts for which decedent remained personally liable. Decedent, in her capacity as grantor and beneficiary of the trust, also agreed to hold the partnership harmless for the Great Western loan and the Union Bank line of credit. The partnership agreement required that the trust's capital account be reduced to the extent that partnership funds were used to pay any of the principal on the Great Western loan or the Union Bank line of credit.

---

[2]This type of partnership is also generally known as a family limited partnership ("FLP").

As of February 7, 1995, after the Seamans vacated the Padaro Lane property, the partnership leased it at $3,500 per month to Michael Healy and Timothy Walsh under a 24-month lease. In August 1995, decedent's long-term care insurance expired, prompting the Bigelow children to consider the sale of the Padaro Lane property. Up to this point, the rental receipts from the Padaro Lane property were deposited into a partnership bank account, and the expenses for the Padaro Lane property were paid from partnership funds. Despite decedent's personal obligation to make the $2,000 monthly payment on the Great Western loan, the partnership made each payment in her stead, while decedent's trust paid $750 monthly toward the Union Bank debt.

Decedent initially met her financial obligations, but her revenue sources dwindled over time. At first, decedent received income from a trust that she and her late husband had established in 1954 ("the 1954 trust"), the corpus of which was an insurance policy on the life of decedent's husband. When the partnership was formed in 1994, decedent had monthly income of $9,300 from the following sources: (1) residential care insurance policies and a Fireman's Fund/ American Express policy: $2,100; (2) an AARP/Prudential policy: $1,500; (3) rental income from the Padaro Lane property: $3,500; and (4) other income: $2,200. Decedent's monthly expenses were: (1) assisted living: $3,600; (2) health insurance supplement: $150; (3) miscellaneous medical: $100; (4) servicing of Great Western loan: $2,000; (5) servicing of the Union Bank debt: $750; (6) flood and liability insurance: $350; (7) property taxes: $1,000; (8) storage: $150; and (9) phone and miscellaneous costs: $50, all of which totaled $8,350. After the Padaro Lane property was transferred to Spindrift, decedent no longer received the rent from the real property and her income was reduced to $5,800 ($9,300 - $3,500). Her expenses were reduced to $7,000 ($8,350 - $1,350) by shifting the property taxes and home owner's insurance to Spindrift. The trust's transfer of the Padaro Lane property thus created a shortfall for decedent of

$1,200 ($5,800 - $7,000). Though the debt secured by the Padaro Lane property was not transferred to the partnership, the partnership nevertheless paid the $2,000 monthly payment on the Great Western loan, which offset decedent's shortfall. After her death, decedent's capital account was reduced to reflect the extent to which these payments went toward the principal of the loan. As the Estate concedes, however, most of the monthly payment, especially at the beginning, went toward the interest on this loan and was not offset by a debit to decedent's Spindrift account.

The $1,500 monthly benefit under decedent's AARP/ Prudential residential care insurance policy expired in August 1995, reducing decedent's monthly income to $4,300 ($5,800 - $1,500), and creating a shortfall of $2,700 ($4,300 - $7,000). In August 1996, the $2,100 monthly benefit under the Fireman's Fund/American Express policy expired, further reducing decedent's income to $2,200 ($4,300 - $2,100), which created a deeper shortfall of $4,800 ($2,200 - $7,000). After these policies expired, Bigelow informed the trustee of the 1954 trust that decedent did not have enough income to pay her expenses. As a result, the trustee of the 1954 trust disbursed the remaining assets and terminated the 1954 trust. By April 1997, the trustee had distributed a total of $68,214 to decedent from the 1954 trust.

On August 8, 1997, decedent died. Bigelow, as trustee, signed a statement of ownership in which he certified the following division of Spindrift shares, which reflected the gifted interests by decedent during her lifetime: Decedent's trust: 1 A Unit, 8,250 B Units; Estate of Fitzgerald: 1 A Unit, 2,500 B Units; Burke: 1 A Unit, 2,700 B Units; Bigelow: 1 A Unit, 1,050 B Units. The total partnership interest was 4 A Units and 14,500 B Units. Bigelow certified that decedent's nine grandchildren had income rights associated with 1,800 B units (200 units each), though the B units themselves were still owned by the trust as general partner because the grandchildren were never substituted as limited partners. Disregarding

the limited partnership interests associated with the income rights transferred to decedent's grandchildren, decedent's trust owned a 1% general partnership interest and a 45% limited partnership interest in the partnership on August 8, 1997.

From April 6, 1995 to August 8, 1997, Bigelow transferred funds between the Spindrift partnership and decedent's trust forty times. Bigelow transferred funds from the trust to the partnership soon after it was formed to pay the property taxes on the Padaro Lane property. These transfers, which are characterized by the Estate as "loans," were interest free and unaccompanied by a promissory note. Bigelow transferred funds from the partnership to decedent's trust to repay the earlier advances and later to pay decedent's expenses. When decedent died, decedent's trust owed Spindrift $3,500 - $1,500 for a "loan" in July 1997 and $2,000 to cover funeral expenses.

On September 3, 1997, the partnership agreed to sell the Padaro Lane property for $1,475,000. The partnership received $949,490.33 from the sale on November 21, 1997 after decedent's debt was fully retired. The partnership began distributing the proceeds to the partners, including the trust, by December 1997. Until then, the partnership had not made formal distributions to its partners, notwithstanding any "advances" made to decedent before her death. After her death, the trust continued to act as the general partner of the partnership until the partnership was terminated as of December 31, 1998. Final distributions were made to the partners, and the partnership's dissolution documents were recorded in the office of the California Secretary of State.

## C

On November 9, 1998, Bigelow, as executor of decedent's estate, signed gift tax returns for 1994-97 and decedent's estate tax return, which the Internal Revenue Service ("IRS") received on November 12, 1998. On the gift tax returns, Bigelow reported that decedent had made taxable gifts of $463,960

in 1994, $10,785 in 1995, zero in 1996, and $2,000 in 1997. Bigelow reported that decedent had given limited partnership interests in Spindrift to her children and grandchildren valued at $61.85 per unit in 1994 and 1995, $67.79 per unit in 1996, and $61.90 per unit in 1997, applying a 31% discount for lack of marketability. Bigelow reported on the 1994 gift tax return that decedent had made cash gifts of $10,000 to Bigelow and $10,000 to his wife, forgiven Bigelow $150,000 of indebtedness evidenced by a promissory note, and assigned interests in a promissory note payable to decedent by Bigelow to Franklin T. Bigelow III and Anna D. Bigelow, at $5,000 each. Bigelow also reported on the 1995-97 gift tax returns combined cash gifts to himself and his wife of $7,350 in 1995, $7,500 in 1996, and $22,000 in 1997.

On the estate tax return, Bigelow reported a gross estate of $175,957.57 and taxable gifts of $463,070. The amount reported as the gross estate included $10,000 of personal property, the refund of a $2,460 deposit owed to decedent by the assisted-living facility, and $163,497 of transfers during decedent's life. The amount reported as transfers during decedent's life included $135,079.88 for decedent's limited partnership shares in Spindrift; $19,912.50 for her general partnership interest in Spindrift; $5,416.83 held by the trust ($8,492.30 in a Merrill Lynch cash account offset by an overdraft of $3,075.47 in the checking account); a $169.38 cash payment due from Boston Company; and $2,918.98 in a savings account.

In computing the value of decedent's limited partnership interest ($135,079.88) on the estate tax return, the Tax Court determined that Bigelow applied the following calculation: "(1) Computed 44% of $1,475,000 (the value of the Padaro Lane property); *i.e.*, $649,480.85, (2) subtracted $435,069.75; *i.e.*, the amount of the Great Western Bank loan and the Union Bank line of credit secured by the property, and (3) applied to the remainder a 37-percent discount for lack of marketability." *Bigelow v. Comm'r*, 89 T.C.M. (CCH) 954,

959 (2005). Bigelow also reported that the value of decedent's general partnership interest was $19,912.50, computed by taking 1% of the value of the Padaro Lane property and applying a 35% control premium.

After an audit, the IRS issued a notice of deficiency of $217,480.05 on October 29, 2001. The IRS determined that the full value of the Padaro Lane property, rather than the value of decedent's interest in Spindrift discounted for lack of control and marketability, should be included in the gross estate because decedent had retained "the possession, enjoyment, or the right to income from the asset that she transferred to Spindrift . . . within the meaning of Internal Revenue section 2036(a)."[3]

After a bench trial, the Tax Court upheld the deficiency imposed by the Commissioner. The Tax Court concluded that "Decedent's use of partnership income to replace the income lost because of the transfer of the Padaro Lane property to the partnership shows that there was an implied agreement between decedent and her children that she would retain the right to the income from the Padaro Lane property." *Id.* at 960. The Tax Court also found decedent used partnership income to secure the Great Western loan and the Union Bank line of credit, which further evidenced an implied agreement that "she would retain for her life the present economic benefit of the Padaro Lane property." *Id.* Finally, the Tax Court determined that the transfer of the Padaro Lane property was not made in good faith because the transfer would have "impoverished" decedent, *i.e.*, left her unprepared to meet her financial needs absent an implied agreement that Spindrift would supplement her income, *id.* at 960; the Bigelow children had not implemented partnership formalities, *id.* at 960-

---

[3]As discussed *infra*, § 2036(a) "recaptures certain assets transferred prior to death in the gross estate." *Kimbell v. United States*, 371 F.3d 257, 260 (5th Cir. 2004).

61; and there was no evidence that any nontax purpose animated the formation of Spindrift. *Id.* at 961.

The Estate timely appeals.

## II

The Estate advances two main arguments that the Tax Court erred in upholding the Commissioner's deficiency determination. First, the Estate argues that the Tax Court clearly erred in finding that there was an implied agreement that decedent would retain the enjoyment of, or derive income from, the Padaro Lane property. Second, the Estate argues that the Tax Court erred in concluding that the "bona fide sale for an adequate and full consideration" exception under § 2036(a) did not apply to the transfer of the Padaro Lane property from the trust to the Spindrift family partnership.

The federal estate tax imposed under the Internal Revenue Code applies generally to the value of assets that pass from an individual at death to the beneficiaries of the decedent's estate. *See* 26 U.S.C. § 2001. A "taxable estate" is defined as "the value of the gross estate," less applicable deductions, *id.* § 2051, where the value of the "gross estate" includes "the value of all property to the extent of the interest therein of the decedent at the time of his death." *Id.* § 2033. In addition, § 2036(a) ("Transfers with retained life estate") provides:

> The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

> (1)   the possession or enjoyment of, or the
> right to the income from, the property . . . .

*Id.* § 2036(a)(1).

**[1]** Section 2036(a)(1) is designed to recapture the value of certain assets transferred by the decedent during his or her lifetime where the decedent has retained economic benefits from the transferred asset. *See Kimbell*, 371 F.3d at 261. "Section 2036(a) is . . . intended to prevent parties from avoiding the estate tax by means of testamentary substitutes that permit a transferor to retain lifetime enjoyment of purportedly transferred property." *Strangi v. Comm'r*, 417 F.3d 468, 476 (5th Cir. 2005), *pet. for r'hrg granted on other grounds*, 429 F.3d 1154 (5th Cir. 2005); *see also Estate of Thompson v. Comm'r*, 382 F.3d 367, 375 (3d Cir. 2004). This value-recapturing provision under § 2036(a) is in keeping with longstanding congressional recognition that *inter vivos* gifts would undermine the effectiveness of the federal estate tax if the IRS could not recoup the value of "transfers that are essentially testamentary — *i.e.*, transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime." *United States v. Estate of Grace*, 395 U.S. 316, 320 (1969) (holding assets transferred *inter vivos* under reciprocal trusts could not escape operation of predecessor statute to § 2036); *see also Helvering v. Hallock*, 309 U.S. 106, 114 (1940) (recognizing "the governing principle of § 302(c) [of the Revenue Act of 1926] that Congress meant to include in the gross estate inter vivos gifts which may be resorted to, as a substitute for a will, in making dispositions of property operative at death") (internal quotation marks omitted).

**[2]** An estate can avoid the operation of § 2036(a)(1) by demonstrating that the decedent did not retain "the possession or enjoyment of, or the right to the income from, the property." 26 U.S.C. § 2036(a)(1). Even where the decedent has retained an interest in the transferred asset, moreover, § 2036(a) is inapplicable if the asset was transferred in a

"bona fide sale for an adequate and full consideration in money or money's worth." § 2036(a); *see also Thompson*, 382 F.3d at 375; *Strangi*, 417 F.3d at 478; *Estate of Maxwell v. Comm'r*, 3 F.3d 591, 593, 595 (2d Cir. 1993).

We address first whether the decedent, Ms. Bigelow, retained any cognizable economic benefits from the Padaro Lane property under § 2036(a)(1) after the trust's transfer of the real property to Spindrift. We agree with the Tax Court that decedent and the Bigelow children impliedly agreed that decedent would have access to income from the transferred property and that decedent continued to enjoy the economic benefit that the property secured her personal debt. Next, we address the question of whether the transfer of the property was a "bona fide sale for an adequate and full consideration" under § 2036(a)'s parenthetical exception. We conclude that the Tax Court correctly upheld the deficiency.

## A

[3] Applicability of § 2036(a)(1) turns on whether "there is an express or implied agreement at the time of transfer that the transferor will retain lifetime possession or enjoyment of, or right to income from, the transferred property." *Thompson*, 382 F.3d at 375. The existence of an implied agreement is a question of fact reviewed for clear error. *See Estate of Korby v. Comm'r*, 471 F.3d 848, 852 (8th Cir. 2006). "In reviewing for clear error, we ask only whether the Tax Court's findings are supported by evidence in the record as a whole, not whether we would necessarily reach the same conclusions." *Strangi*, 417 F.3d at 480.

The Tax Court found that there was an implied agreement between decedent and the Bigelow children that decedent would retain income and the benefit of using the Padaro Lane property to secure her debt. As to the retained income, the Tax Court explained:

After the partnership was formed, decedent used $2,000 of the $2,150 net income from the rental of the Padaro Lane property to make monthly payments on the Great Western loan. After the AARP/ Prudential residential care insurance policy expired in August 1995, decedent's expenses exceeded her income by $2,700. The partnership continued to make the $2,000 payments on the Great Western loan, and Mr. Bigelow transferred partnership funds to decedent's trust to support decedent. No distributions were made to any other partner before decedent's death.

*Bigelow v. Comm'r*, 89 T.C.M. (CCH) 954, 959-60 (2005). As to the decedent's retention of the Padaro Lane property as security for her personal debt, the Tax Court found:

After the transfer of the Padaro Lane property to Spindrift, the property continued to secure decedent's legal obligation to pay the $350,000 Great Western Bank loan and the $100,000 Union Bank line of credit. Thus, decedent retained the economic benefit of ownership of the Padaro Lane property after it was transferred to the partnership.

*Id.* at 960.

The Estate disputes the Tax Court's first finding, arguing that decedent did not receive income in the form of debt cancellation or otherwise because under the partnership agreement each debt payment toward the principal was reduced from decedent's share in Spindrift and shifted to the other partners. The Estate disputes the Tax Court's second finding, claiming that Spindrift assumed a "practical liability" for the Great Western loan, even though the decedent remained personally liable for this debt and the Union Bank line of credit. The Estate rests its theory of practical liability on two grounds. The Estate first contends that under the Deed of

Trust, the trust assigned rental income from the Padaro Lane property to Great Western as additional collateral for the loan; and second that the transfer of the Padaro Lane property to Spindrift carried with it a practical obligation to meet the loan repayment schedule with the rental income to avoid foreclosure. The Commissioner responds that the practical necessity that Spindrift repay the debt is evidence itself of an implied agreement that the Bigelow children would supplement decedent's financial needs because decedent's transfer of her main asset, while retaining the indebtedness secured by it, would have left her unable to meet her monthly expenses without resort to partnership funds.

[4] We agree with the Commissioner. A key problem with the conveyance of the Padaro Lane property to Spindrift is, for estate tax purposes, that the Great Western and Union Bank debt that was secured by the property was not also transferred. This discrepancy indicates that Spindrift repaid the debt in decedent's stead despite no legal obligation to do so. Because Spindrift used funds to make these payments of debt that were derived from income on the property decedent had purported to transfer to Spindrift, it supports the Commissioner's position that decedent retained an interest in the property. In an effort to deflect the significance of decedent's legal obligation to repay her debt, the Estate argues that it had a "practical liability" to make the $2,000 monthly payment purportedly to avoid foreclosure. But whether or not Spindrift had any practical need to make monthly payments does not undercut the finding that decedent retained the economic benefit from the transferred property.

[5] As to the Estate's second theory, the Tax Court also did not clearly err in finding an implied agreement, in light of the entire record, that decedent was to receive income from the Padaro Lane property. Bigelow testified that his mother, the decedent, wanted her initial contribution of the property, and any potential gifted partnership shares "to be free and clear of the debt . . . — she felt it was her responsibility to keep . . .

those obligations." As a practical matter, however, decedent shifted her responsibility to the partnership. First, assuming *arguendo* the propriety of debiting decedent's capital account *post mortem* to reflect the extent to which these payments went toward *the principal* of the Great Western loan, Bigelow testified before the Tax Court and conceded at oral argument that any payment toward *the loan interest* was not similarly debited. Bigelow also testified that interest payments consumed the majority of each payment. In light of this concession, it is clear that decedent received income each month — slightly less than $2,000 according to the Estate's testimony — because Spindrift paid the interest on the loan that she was legally obligated to pay, and in this sense decedent retained an interest in the property that decedent had purported to transfer to Spindrift.

The record also supports the Tax Court's finding that decedent received piecemeal income to supplement her financial needs. In the absence of an expectation that the partnership would supplement decedent's monthly income as necessary, the transfer of the Padaro Lane property — her major asset — would have impoverished decedent and left her vulnerable to monthly shortfalls. The Bigelow children knew that the decedent's long-term care coverage was of fixed duration — the AARP/Prudential residential care insurance policy was set to expire in August 1995 and the Fireman's Fund/American Express policy in August 1996 — with the foreseeable possibility that decedent might outlive the coverage. In this event, decedent stood to lose $3,600 per month after the expiration of the second policy in August 1996. Yet both Bigelow and Burke testified that they were unwilling to pay for their mother's care out of their own funds. This testimony supports the Tax Court's finding. In the foreseeable absence of other funds, and the fact that decedent received a $1,500 "loan" in July 1997 and Spindrift advanced $2,000 after decedent's death to cover funeral expenses, it is a reasonable inference that the Bigelow children and decedent had an implied agree-

ment that decedent could access funds as needed that were derived from the Padaro Lane property.

The Bigelow children also testified that as the expiration of the Fireman's Fund/American Express policy in August 1996 approached, the Bigelow children began taking steps to put the Padaro Lane property on the market to liquidate the asset and have funds available to cover the decedent's living expenses. In fact, Burke testified that because she would not pay decedent's additional expenses out of her own pocket, she viewed liquidation of decedent's Spindrift shares through sale of the house as the only option. The Bigelow children also testified that they were committed to their mother's care and maintaining her in a manner to which she was accustomed. This testimony suggests that the decedent's need of funds, rather than other unrelated business criteria that might have informed partners operating at arm's length, drove Spindrift's decision after August 1996 to consider liquidating the asset.

The Tax Court's finding that partnership formalities were not observed buttresses the conclusion that there was an implied agreement. Bigelow testified that the partnership accounts were not regularly re-balanced to reflect the monthly $2,000 payments toward the Great Western debt that Spindrift made for decedent. The Estate relies on a provision in the partnership agreement that Spindrift funds could be used "to retire any of the principal of the Contribution Debt (at the time of the sale of the Property, or, otherwise)" to suggest that the partners' capital accounts could have been re-balanced after the sale of the Padaro Lane property in compliance with partnership formalities. Reliance on this provision in the partnership agreement is unavailing. It is inconsistent that decedent's capital account was duly debited in annual updates to reflect the yearly gifts made to children and grandchildren between 1994 and 1997, yet a similar annual update was not implemented to reflect the payments of the Great Western debt during the same period. Moreover, no other partner benefited from such an informal and ad hoc access to partnership

funds. Finally, the *post mortem* accounting indicates that the decedent and FLP had an implied agreement that decedent could access income from the transferred asset. *See Estate of Reichardt v. Comm'r*, 114 T.C. 144, 155 (2000) (finding "yearend and . . . post mortem adjusting entries made by [a certified public accountant] were a belated attempt to undo decedent's commingling of partnership and personal accounts").

The facts here are analogous to the *Thompson* and *Korby* cases, which upheld the Commissioner's deficiencies in the context of FLPs. In *Thompson*, the Third Circuit upheld the Tax Court's finding of an implied agreement to retain control where decedent transferred 95% of his assets to FLPs, did not retain sufficient assets to support himself for the remainder of his life, and the FLPs made significant cash distributions to the decedent in the three years before his death. *See* 382 F.3d at 376. Likewise in *Korby*, the Eighth Circuit concluded that the Tax Court's findings of an implied agreement were not clearly erroneous where the FLP made several distributions to the decedents' living trusts in the three years prior to their deaths in part to defray the cost of one decedent's nursing home costs. *See* 471 F.3d at 850, 853. Spindrift regularly paid the interest on decedent's loans and any payment toward the principal was not promptly debited from the decedent's capital account. Although these payments may have differed in form from those in *Thompson* and *Korby*, they nonetheless provided supplemental income that defrayed the monthly cost of decedent's assisted-living as her insurance coverage lapsed.

**[6]** The Tax Court here did not commit clear error in determining under § 2036(a)(1) that decedent retained the economic benefit from the transferred asset because decedent continued to use the Padaro Lane property to secure her debt, and because Spindrift paid the monthly payments on the Great Western loan despite decedent's personal obligation to do so. Also, the Tax Court committed no clear error in determining that there was an implied agreement that the Bigelow children

through Spindrift would supplement decedent's financial needs before her death as such needs arose.

**B**

**[7]** The Estate can escape the value-recapturing mechanism under § 2036(a) if it demonstrates that the transfer was "a bona fide sale for an adequate and full consideration in money or money's worth" under the provision's parenthetical exception. 26 U.S.C. § 2036(a).

**1**

Assessment of the "adequate and full consideration" element in § 2036(a) is not straightforward in this context because of the nature of the real property transferred to the FLP. Here, the value of the real property was reconfigured from its fair market price into pro rata partnership interests, which may be subject to a discount from the devaluation in the decedent's partnership interest due to a lack of control and marketability.[4] *See Strangi*, 417 F.3d at 473 ("Because a partnership interest is worth less for tax purposes than a propor-

---

[4]One commentator has explained the rationale for the discount for lack of control and marketability:

> Because the transferee of a partnership interest is guaranteed only to receive distributions that would have been made to the transferor, an unrelated third party would discount the value of the transferred interest on account of the inability to participate in decisions affecting management of the partnership affairs. Furthermore, due to the transferee's inability to require the partnership interest to be redeemed and the absence of an established market on which an interest in a closely held partnership can be readily liquidated, the value of the transferred interest will be discounted to reflect its lack of marketability.

*See* Brant J. Hellwig, *Revisiting* Byrum, 23 Va. Tax Rev. 275, 278 n.8 (2003); *see also id.* at 277-78 ("It is common knowledge that valuation discounts are the driving force behind the widespread use of limited partnerships to transmit wealth.").

tional share of the partnership's assets — due to lack of direct control and non-liquidity — this 'exchange' would reduce the taxable value of the estate.").

The Estate urges us to adopt the Fifth Circuit's test for "adequate and full consideration" set forth in *Kimbell*:

> The proper focus . . . on whether a transfer to a partnership is for adequate and full consideration is: (1) whether the interests credited to each of the partners was proportionate to the fair market value of the assets each partner contributed to the partnership, (2) whether the assets contributed by each partner to the partnership were properly credited to the respective capital accounts of the partners, and (3) whether on termination or dissolution of the partnership the partners were entitled to distributions from the partnership in amounts equal to their respective capital accounts.

*See Kimbell*, 371 F.3d at 266; *see also Strangi*, 417 F.3d at 478 (holding that the consideration requirement "is met only where any reduction in the estate's value is 'joined with a transfer that augments the estate by a commensurate . . . amount.'" (quoting *Kimbell*, 371 F.3d at 262) (alteration in original)).

The Estate claims that it meets the first prong of the *Kimbell* test because the decedent transferred the Padaro Lane property, valued at $1,450,000, in exchange for 14,500 limited partnership units ("B Units" valued at $100). This exchange, continues the Estate, was proportional because decedent initially took a 99.98% interest in Spindrift and the Bigelow children took only a 00.0025%, which reflected their respective $100 contributions. As for the second and third prongs, the Estate argues that the capital accounts belonging to each partner were credited with the amount proportionate to each respective contribution (albeit *post mortem*), and that

each partner received commensurate distribution upon disso-
lution. The Commissioner counters that it is inconsistent to
assert on the one hand that the decedent received a propor-
tional number of limited partnership shares in exchange for
the fair market value of the Padaro Lane property, while
simultaneously claiming that the partnership interests are enti-
tled to a substantial discount for lack of control and market-
ability for estate tax purposes.

In *Estate of Harper v. Commissioner*, the Tax Court
declined to adopt the *per se* rule suggested in the Commis-
sioner's argument that a decedent could not have transferred
an asset to an FLP for "adequate and full consideration" in
light of the consequent reduction in value that results from the
lack of control and marketability. 83 T.C.M. (CCH) 1641,
1654 (2002) ("[I]t is not unreasonable to assume that a *genu-
ine* pooling for business purposes injects something different
into the adequate and full consideration calculus than does
mere, unilateral value 'recycling' . . . . In the former situation,
there is *at least the potential that intangibles* stemming from
a pooling for joint enterprise might support a ruling of ade-
quate and full consideration.") (emphasis added). In *Kimbell*,
the Fifth Circuit likewise rejected the Commissioner's incon-
sistency argument:

> The business decision to exchange cash or other
> assets for a transfer-restricted, non-managerial inter-
> est in a limited partnership involves financial consid-
> erations other than the purchaser's ability to turn
> right around and sell the newly acquired limited part-
> nership interest for 100 cents on the dollar. Investors
> who acquire such interests do so with the expectation
> of realizing benefits such as management expertise,
> security and preservation of assets, capital apprecia-
> tion and avoidance of personal liability.

371 F.3d at 266. The Third Circuit also acknowledged that
"the dissipation of value resulting from the transfer of market-

able assets to a closely-held entity *will not automatically* constitute inadequate consideration for purposes of § 2036(a)." *Thompson*, 382 F.3d at 381 (emphasis added) (citing *Harper v. Comm'r*, 83 T.C.M. (CCH) 1641, 1654 (2002)).

**[8]** We agree with the Third and Fifth Circuits and the Tax Court that an *inter vivos* transfer of real property to a family limited partnership, which inherently reduces the fair market price of the resultant partnership interests, does not *per se* disqualify the transfer from falling under § 2036(a)'s exception. As the qualifying language in all the cases suggests, however, the Estate must demonstrate more than a proportional exchange between $1,450,000 fair market value and 14,500 B Units valued at $100. To avoid the reach of § 2036(a), the Estate must also show the "genuine" pooling of assets, *see Harper v. Comm'r*, 83 T.C.M. (CCH) 1641, 1654 (2002), and a " 'potential [for] intangibles stemming from pooling for joint enterprise,' " *Thompson*, 382 F.3d at 381 (alteration in original) (quoting *Harper*, 83 T.C.M. at 1654). The validity of the adequate and full consideration prong cannot be gauged independently of the non-tax-related business purposes involved in making the bona fide transfer inquiry.

**[9]** In this context, we consider the "bona fide sale" and "adequate and full consideration" elements as interrelated criteria. *See Estate of Bongard v. Comm'r*, 124 T.C. 95, 118-19 (2005) ("In the context of family limited partnerships, the bona fide sale for adequate and full consideration exception is met where the record establishes the existence of a legitimate and significant nontax reason for creating the family limited partnership, and the transferors received partnership interests proportionate to the value of the property transferred."). *But see Strangi*, 417 F.3d at 478 (treating § 2036(a) exception as having two "discrete requirements").

**[10]** In *Estate of Bongard*, the Tax Court explained that a "bona fide" transfer is "applicable only where there was an arm's-length transaction." 124 T.C. at 122. Although intra-

family transfers are permitted under section § 2036(a), they are subject to "heightened scrutiny." *See Kimbell*, 371 F.3d at 263. Courts look to whether the "terms of the transaction differed from those of two unrelated parties negotiating at arm's length." *Bongard*, 124 T.C. at 123. The crux of the bona fide transfer inquiry is whether the taxpayer can demonstrate that the transfer had "legitimate and significant nontax reasons." *Id.*; *see also Kimbell*, 371 F.3d at 267. Courts that have considered this issue hold uniformly that an objective standard is applied to determine whether the decedent's *inter vivos* sale of assets to an FLP was bona fide.[5] *See Korby*, 471 F.3d at 854 (" '[A] sale is bona fide if, as an objective matter, it serves a substantial business [or] other non-tax purpose.' ") (quoting *Strangi*, 417 F.3d at 479; *Kimbell,* 371 F.3d at 262-63) (internal quotation marks and citation omitted; alteration in original); *Thompson*, 382 F.3d at 383 ("[O]bjective indicia that the partnership operates a legitimate business may provide a sufficient factual basis for finding a good faith transfer."); *Kimbell*, 371 F.3d at 265 (applying objective criteria to distinguish the legitimate transfer from the "sham transaction or disguised gift"); *Bongard*, 124 T.C. at 118 ("The objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation.").

## 2

The Tax Court found that the parenthetical exception did not apply because the transfer of the Padaro Lane property to the Spindrift partnership was not executed in good faith, resting its decision on three grounds: (1) the transfer resulted in the impoverishment of the decedent, who, before the transfer,

---

[5]In *Wheeler v. United States*, the Fifth Circuit first recognized that before its amendment in 1976, the U.S. Tax Code contained a provision recapturing into the gross estate "transfers 'intended to take effect in possession or enjoyment' at or after the decedent's death and those made 'in contemplation of death.' " 116 F.3d 749, 765 (5th Cir. 1997). In codifying § 2036(a), Congress intended to replace any subjective intent determinations with objective requirements. *Id.* at 766.

was able to meet her financial needs but required assistance from the partnership afterward until her death, *Bigelow v. Comm'r*, 89 T.C.M. (CCH) 954, 960 (2005); (2) the partnership did not honor partnership formalities, *id.* at 960-61; and (3) the transfer did not create a potential non-tax benefit for the decedent.[6] *See id.* at 961. We conclude that the Tax Court did not err in declining to apply the parenthetical exception on these bases.

[11] With respect to the first two findings, the Tax Court did not err in concluding that, in the absence of an implied agreement that decedent would retain income, the transfer of the Padaro Lane property in December 1994 — her major asset — would have impoverished the decedent. The transfer left her unable to meet her financial obligations whereas prior to the transfer she had applied the $3,500 monthly rental income under the Seaman's lease toward her monthly expenses.[7] That decedent's trust transferred the Padaro Lane property, which accounted for the vast bulk of her assets, invites salient comparison with the *Thompson* and *Korby* cases.

In *Thompson*, the Third Circuit examined the legitimacy of two FLPs into which the decedent, at age ninety-five, transferred $2.8 million in assets ($2.5 million in the form of marketable securities) while retaining $153,000 in personal assets. The decedent continued to receive an annual income of $14,000 to offset yearly expenses of $57,202, with an actu-

---

[6]We review the question whether there was a bona fide sale for an adequate and full consideration for clear error. *See Korby*, 471 F.3d at 852; *Strangi*, 417 F.3d at 479-80.

[7]As the Tax Court calculated, "When decedent formed the partnership in 1994, she had monthly income of $9,300 ($3,600 from two residential care insurance policies, $3,500 from rent paid on the Padaro Lane property, and $2,200 from other sources). . . . [H]er monthly expenses averaged $8,350 ($3,600 for assisted living expenses, $2,750 for the Great Western Bank loan and Union Bank line of credit, $1,350 for property taxes and insurance, and $650 for other expenses)." *Bigelow v. Comm'r*, 89 T.C.M. (CCH) 954, 960 n.5 (2005).

arial life expectancy of 4.1 years. 382 F.3d at 370. The Third Circuit upheld the Tax Court's finding of an implied agreement, pointing to the "general testamentary character of the partnership arrangements" that supported the finding:

> Decedent transferred the vast majority of his investment assets to two family limited partnerships when he was ninety-five years old. The record reveals, with one exception, that neither partnership engaged in business or loan transactions with anyone outside of the family. Transferring this type and volume of assets to family partnerships under these circumstances is more consistent with an estate plan than an investment in a legitimate business.

*Id.* at 377 (footnote omitted). The Eighth Circuit similarly recognized that the extent to which a decedent transfers the majority of his or her assets will be a probative factor in determining whether there was a legitimate, non-tax rationale for the creation of and participation in an FLP. *See Korby*, 471 F.3d at 853 (noting that the Korbys retained less than $10,000 in assets in a living trust, their sole source of income, after they contributed over $1.8 million to fund an FLP).

As discussed *supra*, Spindrift did not assume the Great Western debt when decedent's trust conveyed to Spindrift the Padaro Lane property, yet the partnership nonetheless made monthly payments for decedent. Although the Estate argues that Spindrift had a "practical liability" to make the $2,000 monthly payment (purportedly to avoid foreclosure), that does not erase the fact that when the trust transferred the property decedent did not, as a legal matter, receive adequate and full consideration in light of her assumption of the debt. Conversely, that the Estate repaid the debt gratuitously suggests that the transfer without the debt would have impoverished her and that any anticipated shortfall could not be remedied absent an implied agreement that Spindrift would supplement decedent by servicing her debt.

**[12]** As to the Tax Court's second finding, any attempt to treat other disbursements as "loans" is unpersuasive because the partnership formality of proper accounting was not adequately observed in re-balancing the partners' capital accounts to reflect the disbursements. As discussed s*upra*, the Estate's *post mortem* debiting of decedent's account is insufficient in the face of evidence of an implied agreement. *See Reichardt*, 114 T.C. at 155.

Finally, the Estate argues that the Tax Court clearly erred in not recognizing that Spindrift had non-tax-related benefits. First, the Estate argues that a partnership shielded the included family members from personal liability for any injuries occurring on the Padaro Lane property, whereas as tenants in common they would have been exposed. This argument is unsupported by the record. The Tax Court correctly found that the partnership provided no liability protection to decedent because her trust was both a limited partner and a general partner. Also, there was no evidence that any of Spindrift's partners reasonably faced any genuine exposure to liability that might have validated the partnership formation for a non-tax purpose.

The Estate's lack of evidentiary support for its claim is analogous to circumstances in which the Fifth and Eighth Circuits declined to accept potential liability exposure as a legitimate, non-tax-related justification for the formation of an FLP. In *Korby*, the Eighth Circuit rejected the estate's unsupported assertions that the FLP in that case "was created to protect the family from commercial and personal injury liability arising from their bridge-building business, as well as liability from divorce . . . [where] the estate ha[d] not shown that the terms of the [FLP] agreement would prevent a creditor of a partner from obtaining that partner's [FLP] interest in an involuntary transfer." 471 F.3d at 854 (internal quotation marks omitted). In *Strangi*, the Fifth Circuit was also unconvinced by the estate's claim that it was vulnerable to a personal injury claim where a housekeeper who had cared for the

decedent had an accident on the decedent's property and no evidence was presented that the maid ever threatened to take such action. *See* 417 F.3d at 480; *cf. Kimbell*, 371 F.3d at 268 (acknowledging legitimate risk of personal liability where decedent transferred into FLP working interests in oil and gas properties and, absent partnership formation, the family members as individuals would have faced exposure for environmental torts arising on those properties).

[13] As in *Korby* and *Strangi*, the Tax Court committed no clear error in rejecting the Estate's proffered non-tax justifications absent some concrete incident or circumstance that reasonably motivated the family to form a partnership to shield itself from liability. The Tax Court did not clearly err in refusing to credit claims that the partnership was formed in part to shield the included family members from liability where the Estate could point to no particular incident that could give rise to a personal injury claim, and no general conditions of the purported business venture that posed inherent risks of litigation.[8] Under the same rationale, we also reject the proffered nontax rationale that the formation of Spindrift would serve to protect the Padaro Lane property from a partition sale. There was no evidence that any of the Bigelow children or grandchildren contemplated such an action, or that any of the Bigelow children or grandchildren had creditors which might resort to such a forced sale.

The Estate also argues that consolidation of the real property, with its fractionalized interests and absentee ownership, into an FLP facilitated management of the Padaro Lane property and enhanced the ease of gifting interests to decedent's children and grandchildren. The Tax Court correctly rejected

---

[8]Bigelow testified that the Padaro Lane property, situated on the coast in Carpinteria, California, caused the family concern because of the inherent risk of a fall occurring from or around the seawall. In light of the entire record, it was not clear error to disregard this evidence as speculative and unpersuasive.

this claim. First, gift giving is considered a testamentary purpose and cannot be justified as a legitimate, non-tax business justification. *See Thompson*, 382 F.3d at 373-74, 379. Moreover, efficient management might count as a credible non-tax business purpose, but only if the business of the FLP required some kind of active management as in *Kimbell*. In that case, the Fifth Circuit concluded that the working interests in the decedent's transferred oil and gas properties required active management, which the partnership enhanced because it allowed the participant family members to pool resources, reduce administrative costs and protect the family concern in case decedent's son, who possessed the business expertise, grew too ill to manage the business. *See Kimbell,* 371 F.3d at 268. Here, by contrast, the Padaro Lane property was Spindrift's sole asset, required no active management, and was the partnership's only business. *See Strangi*, 417 F.3d at 481 (concluding transfer of assets had no legitimate non-tax rationale where the partnership "never made any investments or conducted any active business following its formation").

There was no convincing evidence before the Tax Court that Bigelow could not efficiently manage the property as trustee of decedent's trust, as he had done between 1991 and 1994. As such, the Tax Court could reasonably reject the Estate's contention that the alleged purpose of active management motivated the formation of Spindrift, despite allegations that the partnership conducted business transactions with "tradesmen, repairmen, gardeners, utility companies, cleaning service providers, real estate agents, [and] insurance brokers . . . ." Bigelow testified that before formation of Spindrift, the maintenance of the Padaro Lane property entailed little effort or oversight. The tenant, Peter Seaman, simply telephoned with a request for occasional repairs; Bigelow responded that Seaman should bill him as trustee, and the trust reimbursed the tenant. This testimony belies the implication of the Estate's claim that the "business" of renting the Padaro Lane property was extensive, cumbersome or time consuming. That "transactions" with repairmen and others occurred does not

transform simple home ownership into a business asset that demands active management. The Tax Court did not clearly err in distinguishing the asset here from the working interests in oil and gas properties in *Kimbell*.

Finally, we evaluate these arrangements through the heightened scrutiny of intra-family transactions. While FLPs are not vehicles to circumvent estate tax liability *per se*, *see Kimbell*, 371 F.3d at 263, we consider whether "the terms of the transaction differed from those of two unrelated parties negotiating at arm's length." *Bongard*, 124 T.C. at 123. Here, it is improbable that two persons operating at arm's length would either assume that debt repayment would occur due to a "practical liability," or that interest-free "loans" between partners would not be memorialized in a promissory note or accompanied by prompt adjustment to the partners' capital accounts. Moreover, the fact that decedent retained personal liability for $439,062 in debt secured by the transferred asset further supports the Tax Court's finding that the parenthetical exception to § 2036 did not apply for lack of adequate and full consideration for the Padaro Lane property.

## III

We conclude that the Tax Court properly found under § 2036(a)(1) that decedent retained an economic benefit from the transferred asset because the Padaro Lane property continued to secure the debt for which decedent was personally liable. The Tax Court likewise did not err in determining that decedent and the Bigelow children had an implied agreement that decedent would derive income from the transferred asset because Spindrift paid decedent's monthly $2,000 payment on the Great Western loan, and the record supported the finding that in the absence of an implied agreement, decedent would have been impoverished and unequipped to meet her financial needs. We also conclude that the Tax Court correctly found that the *inter vivos* transfer of the Padaro Lane property was not executed for any legitimate, significant non-tax-related

business purpose based on objective criteria that would have informed the partners of Spindrift if they had been operating at arm's length. To the contrary, the record supported the finding that Spindrift was formed to facilitate the transfer of the Padaro Lane property to decedent's children and grandchildren primarily as a testamentary substitute, with the advantage of lowering the gross estate by applying the discounts for lack of control and marketability. The Tax Court did not clearly err in determining that the transfer was not a bona fide sale for an adequate and full consideration under § 2036's parenthetical exception.

**AFFIRMED.**