T.C. Memo. 2007-367


UNITED STATES TAX COURT


ESTATE OF CONCETTA H. RECTOR, DECEASED, JOHN M. RECTOR, II,
CO-EXECUTOR and CO-TRUSTEE, Petitioner v. COMMISSIONER
OF INTERNAL REVENUE, Respondent


Docket No. 20860-05.                    Filed December 13, 2007.


Edwin C. Anderson, Jr., Daniel E. Post, and Michael D.
Maciel, for petitioner.

Alan E. Staines, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


LARO, Judge:  Petitioner petitioned the Court to redetermine

a $1,633,049 Federal estate tax deficiency and a $92,790

accuracy-related penalty under section 6662(a).[1] Following concessions, we decide whether Concetta H. Rector (decedent) retained the possession or enjoyment of, or the right to the income from, property transferred to Rector Limited Partnership (RLP) for purposes of section 2036(a)(1). We hold she did.[2] We also decide whether decedent's estate (estate) is liable for an accuracy-related penalty under section 6662(a) for failure to include as adjusted taxable gifts on the Federal estate tax return prior gifts of $595,000. We hold the estate liable for the penalty.

FINDINGS OF FACT

1. <u>Preface</u>

Some facts were stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. Decedent was a resident of the State of Nevada when she died testate on January 11, 2002, at the age of 95. Decedent's son, John M. Rector II (John Rector), is coexecutor of decedent's estate. When the petition was filed, John Rector resided in Sonoma County, California.

---

[1] Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code, Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded.

[2] Given this holding, we do not consider respondent's other arguments in support of respondent's determination that the value of the property is includable in decedent's gross estate.

2. Decedent and Her Family

Decedent was born in 1906. She was married to John Rector, Sr. (Jack Rector). Decedent and Jack Rector had two sons, John Rector and Frederic Rector. John Rector has been a licensed investment broker since 1961, and he has managed equity, fixed income, venture capital, and other investments. John Rector also holds a securities license, a commodities license, an insurance license, an options license, and a registered investment advising license. John Rector was actively involved in decedent's finances.

3. Decedent's Trusts

In 1975, decedent and Jack Rector created a trust. After Jack Rector died in 1978, the trust was bifurcated into Trust A and Trust B. John Rector was the investment counselor to Trust A and Trust B. In that capacity, John Rector managed the investment portfolio of each trust, recommended transactions to decedent, and executed the transactions she authorized him to make. John Rector also was a cotrustee of Trust A and Trust B. Decedent was the other cotrustee of Trust A, and Frederic Rector was the other cotrustee of Trust B.

The property transferred to Trust A was decedent's share of the community property from her marriage, decedent's separate property, and one-half of Jack Rector's gross estate. Decedent

was entitled to the income and principal of Trust A and had a power of appointment with respect to its remainder.

The property transferred to Trust B was Jack Rector's remaining assets. Decedent's interest in Trust B was a life estate, consisting of distributions of monthly income. The terms of the Trust B agreement directed that the cotrustees make monthly payments of the net income to decedent during her lifetime and allowed the cotrustees to pay to decedent "such amounts of trust principal as the Trustee deems necessary for * * * [decedent's] care and comfortable support in * * * her accustomed manner of living, but only if the principal of Trust A may not in the judgment of the Trustee be readily used for these purposes." The Trust B agreement stated that upon the death of decedent, her sons were entitled to the entire income of Trust B for life, payable monthly, and the remainder of Trust B would be distributed in equal shares to decedent's natural grandchildren.

On October 29, 1991, at the age of 85, decedent created the Concetta H. Rector Revocable Living Trust (1991 revocable trust) to which she transferred the assets of Trust A. Decedent and John Rector were appointed cotrustees of the 1991 revocable trust, and Frederic Rector was named successor cotrustee. The 1991 revocable trust agreement stated that decedent was entitled to all of the income and principal from the 1991 revocable trust.

The 1991 revocable trust agreement granted decedent the power to amend and revoke the 1991 revocable trust by "written notice delivered by Trustor during the lifetime of the Trustor to the Trustees. In the event of such revocation, the Trust Estate [corpus] or revoked portion thereof shall revert to the Trustor as her separate property, as if this Trust had not been created."

4.  Decedent's Move to the Golden Empire Convalescent Hospital

In October 1998, at the age of 92, decedent became a full-time resident of the Golden Empire Convalescent Hospital (hospital). She lived there until she died approximately 3 years later. Her medical expenses, including her residence at the hospital, cost her $24,588 during 1998, $71,798 during 1999, $78,114 during 2000, and $94,822 during 2001.

5.  Plans To Create a Limited Partnership

Among decedent, John Rector, and Frederic Rector, John Rector was the first to consider forming a limited partnership to which to transfer decedent's assets. John Rector learned of the idea from Ed Anderson (Anderson), an attorney who had created a trust for John Rector and his wife and had amended decedent's 1991 revocable trust agreement. Anderson advised John Rector that such a limited partnership would allow decedent to give limited partner interests to her sons and grandchildren, protect her assets from her creditors, and significantly reduce the value

of her gross estate through discounts for lack of marketability and lack of control.  John Rector discussed Anderson's advice with decedent and Frederic Rector, and decedent and her sons decided to pursue the idea.

On September 3, 1998, John Rector met with Anderson and two of Anderson's colleagues to discuss forming a limited partnership to which to transfer decedent's assets.[3]  Afterwards, John Rector met with decedent and Frederic Rector, and the three of them discussed using a limited partnership to save Federal estate tax, to allow decedent to give limited partner interests to her sons, to diversify her assets, and to protect her assets from the reach of her creditors.  Decedent and her sons decided to form RLP without any negotiation over the terms of a partnership agreement.  The three of them intended for decedent to contribute to RLP all assets she held in the 1991 revocable trust, for no one else to make any other contribution to RLP, for decedent to give limited partner interests in RLP to each of her sons, and for decedent to value the gifts at significantly less than the proportionate value of RLP's assets.

In order to structure the partnership and draft the agreement (RLP agreement), John Rector met with the attorneys in

---

[3] The parties stipulated erroneously that the meeting occurred on Sept. 3, 1999.  A stipulated exhibit establishes that the meeting occurred on Sept. 3, 1998.

person, Frederic Rector conversed with the attorneys by telephone, and decedent corresponded with the attorneys. The attorneys believed that they represented decedent in this process, but neither of decedent's sons had separate counsel as to the formation of RLP or as to the structuring and drafting of the RLP agreement.

6.  Formation of RLP and Gifts of Partnership Interests

The RLP agreement was executed on December 17, 1998.[4] Under the terms of the agreement, decedent was a 2-percent general partner in RLP and the 1991 revocable trust was a 98-percent limited partner in RLP. John Rector was listed in the RLP agreement as a 0-percent general partner, but he was not in fact a general partner.[5]

The RLP agreement stated that RLP was formed

> to own and manage the Property contributed by the
> Partners and to conduct any other lawful business that
> a limited partnership may conduct in the State of
> California; to provide a centralized management
> structure for all of such contributed and acquired
> property; and to provide a convenient mechanism for

---

[4] RLP was formed in California and approximately 1 year later merged into a Nevada partnership with an identical partnership agreement. The parties make no distinction between the California and Nevada partnerships, and neither do we.

[5] The parties have stipulated that RLP was formed and operated as a valid, legal entity under State law. Thus, we assume the validity of a partnership created by a single individual as the sole general partner and her revocable trust as the sole limited partner.

various family members to participate in the ownership of family assets.

Article 3.7 of the RLP agreement states that RLP's "net cash flow" shall be distributed as follows:

All distributions of Partnership net cash flow shall be distributed to the Partners in proportion to their Partnership Interests. "Net Cash Flow" means the Partnership taxable income, increased by (1) Any depreciation or depletion deductions taken into account for computing taxable income; and (2) Any non-taxable income or receipts (other than capital contributions from the proceeds of any Partners), and reduced by: (3) Any principal payments on any Partnership debts; (4) Expenditures to acquire or improve Partnership assets; and (5) reasonable reserves, as determined by the General Partners, for future Partnership expenses and improvements.

Article 4 of the RLP agreement elaborates on the management and other specific powers held by the general partners. Article 4.1 and 4.2 states:

4.1  <u>Management by General Partners</u>.  Subject to any limitation imposed elsewhere in this Agreement, the absolute management and control of the business and affairs of the Partnership shall be vested in the General Partners. The General Partners shall have the full, complete and exclusive right, power and authority to act for and bind the Partnership in all matters with respect to the business and affairs of the Partnership. The Limited Partners shall have no right to take part in the management of the Partnership.

4.2  <u>Specific Powers of the General Partners</u>.  The General Partners shall have, subject to any limitations imposed elsewhere in this Agreement, power on behalf of the Partnership to act with regard to any Partnership asset, real or personal, and to do anything reasonably connected with that action. Without limiting this authority, the General Partners shall have the power to

sell, exchange, convey title to, and grant options for the sale of all or any portion of Partnership real or personal property * * * to borrow money and, as security for the borrowing, to encumber all or any part of Partnership property; and to modify, consolidate, or extend any deed of trust or other security device encumbering Partnership property.

On March 9, 1999, approximately 3 months after RLP's formation, RLP was funded by decedent's transfer from the 1991 revocable trust of $174,259.38 in cash and $8,635,082.77 in marketable securities. By virtue of this transfer, the 1991 revocable trust was left with no significant asset other than the 98-percent limited partner interest received in exchange for the transfer of the cash and marketable securities. At the time of the transfer, the Trust B assets were worth approximately $2.5 million. Decedent's entitlement to income from Trust B was $47,439.12 for 1999.

In March 1999, decedent gave each of her sons, through her revocable trust, an 11.11-percent limited partner interest in RLP. Approximately 2 years later, on January 2, 2001, decedent assigned to the 1991 revocable trust her 2-percent general partner interest in RLP. On January 4, 2002, decedent's trust transferred a 2.754-percent limited partner interest in RLP to each of her sons. When she died, decedent (through the 1991 revocable trust) owned a 70.272-percent limited partner interest in RLP and a 2-percent general partner interest in RLP.

7.  Operation of RLP

RLP operated without a business plan or an investment strategy, and it did not trade or acquire investments.  RLP also issued no balance sheets, income statements, or other financial statements.  RLP's partners did not hold formal meetings.

RLP functioned to own investment accounts, to make distributions to partners, and to pay decedent's personal expenses (directly during 1999 and indirectly in later years). RLP maintained monthly statements of investment account activity, including distributions, and a handwritten check register for payments.  Statements of activity and capital accounts were not regularly maintained.

8.  Summary of RLP Distributions

From its formation through December 11, 2001, RLP made distributions to its partners.  During each of 1999, 2000, and 2001, RLP's total distributions to its partners exceeded RLP's annual net income by $491,480.  Of the total distributions, 86 to 90 percent were made to decedent during 1999 and 2000.  RLP's distributions to each partner represented the following percentages of RLP's net income for each year:

|       |                | Percentage of RLP's Net Income/Distribution |
|-------|----------------|---------------------------------------------|
| Year  | Partner        |                                             |
| 1999  | Decedent       | 122.87                                      |
|       | John Rector    | 10.08                                       |
|       | Frederic Rector| 10.08                                       |
| 2000  | Decedent       | 251.92                                      |
|       | John Rector    | 11.99                                       |
|       | Frederic Rector| 11.99                                       |
| 2001  | Decedent       | 57.86                                       |
|       | John Rector    | 43.14                                       |
|       | Frederic Rector| 43.14                                       |

9.  Payment of Decedent's Living Expenses and Tax Liabilities

Before forming RLP, decedent received income from Trust B and from the 1991 revocable trust. Afterwards, decedent continued to receive the same monthly income from Trust B. The income from Trust B was decedent's only significant income besides the distributions that she received from RLP. For 1998, 1999, 2000, and 2001, decedent received income from Trust B of $44,481.34, $47,439.12, $43,001.70, and $42,632.78, respectively. Decedent's expenses for these years were at least $122,587, $180,930, $117,754, and $134,961, respectively. The expenses were attributable to the following:[6]

---

[6] Decedent also made gifts and charitable contributions not listed here.

| Expense | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|
| Medical/hospital residence | $24,588 | $71,798 | $78,114 | $94,822 |
| Federal income tax | 45,174 | 48,221 | 3,650 | 3,239 |
| State/local income tax | 16,835 | 24,911 | -0- | -0- |
| Other living expenses | 36,000 | 36,000 | 36,000 | 36,000 |
| Total | 122,597 | 180,930 | 117,754 | 134,961 |

In 1999, 29 checks were written on RLP's checking account to pay $77,115.03 of decedent's expenses. Decedent wrote 21 of these checks, and John Rector wrote the rest. The 21 checks written by decedent paid the following expenses of decedent:

| Date Check Cleared | Payee | Amount |
|---|---|---|
| 4/14/99 | Taylor Marketing SVC wheelchair | $108.00 |
| 4/16/99 | IRS | 4,311.00 |
| 4/16/99 | CPA Tax Prep | 280.00 |
| 4/19/99 | California Franchise Tax Board (FTB) | 3,902.00 |
| 4/19/99 | FTB | 11,859.00 |
| 4/26/99 | Taylor Marketing SVC wheelchair | 600.00 |
| 4/29/99 | IRS | 7,975.00 |
| 4/30/99 | Jo Barrett caregiver | 50.00 |
| 5/5/99 | Cash | 300.00 |
| 5/10/99 | Spring Hill Pharmacy--Rx | 288.10 |
| 5/14/99 | Jo Barrett caregiver | 50.00 |
| 5/19/99 | Trinity Episcopal Church | 45.00 |
| 5/28/99 | FG Rector gift, b'day | 500.00 |
| 6/7/99 | Spring Hill Pharmacy--Rx | 288.10 |
| 6/8/99 | Jo Barrett caregiver | 60.00 |
| 6/10/99 | Optical shop--glasses | 85.00 |
| 6/11/99 | FTB | 4,311.00 |
| 6/15/99 | IRS | 11,859.00 |
| 6/17/99 | Unknown | 1,500.00 |
| 7/12/99 | Jo Barrett caregiver | 60.00 |
| 7/14/99 | Spring Hill Pharmacy--Rx | 111.56 |
| | | 48,542.76 |

The eight checks written by John Rector paid the following expenses of decedent:

| Date Check Cleared | Payee | Amount |
|---|---|---|
| 3/10/99 | Hospital | $5,301.00 |
| 3/30/99 | HCFA Health Insurance | 763.60 |
| 4/8/99 | Pharmacy | 406.57 |
| 4/8/99 | Anderson Zeigler Disharoon Gallagher & Gray (attorney's fees) | 862.50 |
| 4/8/99 | Convalescent Hospital | 5,130.00 |
| 5/4/99 | Convalescent Hospital | 10,000.00 |
| 5/7/99 | Convalescent Hospital | 5,345.00 |
| 5/10/99 | HCFA Health Insurance | 763.60 |
| | | 28,572.27 |

In April 2000, RLP transferred $348,100 to decedent's 1991 revocable trust. The 1991 revocable trust then issued a check in the same amount, payable to the Internal Revenue Service, for decedent's 1999 Federal gift tax liability. In October 2001, RLP opened a premier variable credit line account and borrowed $1,303,700 on the credit line. On October 21, 2002, RLP transferred $1 million to the credit line and wrote on the credit line a check for $2,038,098 to pay towards the estate's Federal estate tax liability. On October 25, 2002, RLP wrote a check for $262,654 on the credit line to pay the estate's reported California estate tax liability. On May 20, 2005, a check for $384,535 was written on the credit line to satisfy certain

adjustments to tax resulting from omissions on the estate's Federal estate tax return.

## 10. 1991 and 1999 Cash Gifts

In 1991, decedent's attorney recommended that decedent make gifts to John Rector and Frederic Rector during the year in the total amount of $595,000. Decedent followed this recommendation, and she informed John Rector that she had made those gifts. On January 6, 1999, decedent made separate cash gifts of $35,000 to John Rector and Frederic Rector.

## 11. Federal Gift Tax Returns

Decedent filed a 1991 Federal gift tax return on October 30, 1992, reporting $595,000 in gifts to John Rector and Frederic Rector. The return was prepared by an accountant in Nevada County, California.

Decedent filed a 1999 Federal gift tax return on April 15, 2000, reporting gifts of 11.11-percent limited partner interests to each of her sons. This return did not report decedent's $35,000 cash gifts to her sons.

## 12. Value of RLP Assets

The estate elected to value decedent's gross estate as of the alternate valuation date. On that date, the value of the assets owned by RLP was $8,126,579.

13. Federal Estate Tax Return

The estate timely filed a Federal estate tax return on October 16, 2002. The return failed to report the 1991 and 1999 gifts of $595,000 and $70,000, respectively. The return was prepared by Anderson and signed by John Rector as coexecutor of decedent's estate. The Federal estate tax return reported that decedent's gross estate on the applicable valuation date consisted of a single asset; namely, her interest in the 1991 revocable trust. The return elected the alternate valuation date of July 11, 2002, as the applicable valuation date. The return reported that the fair market value of the 1991 revocable trust as of the applicable valuation date was $4,757,325, calculated as follows:

| | |
|---|---|
| Net asset value (NAV) of RLP | $8,126,579 |
| Decedent's interest in RLP | 72.272% |
| Decedent's proportionate share of NAV | 5,873,241 |
| Less 19 percent for lack of control and lack of marketability | 1,115,916 |
| Discounted value of decedent's interest | 4,757,325 |

OPINION

1. Preface

The value of an interest in property is included in a decedent's gross estate if: (1) The decedent made an inter vivos transfer of the property; (2) the transfer was for less than adequate and full consideration; and (3) the decedent retained

the possession or enjoyment of, or the right to the income from, the transferred property. See sec. 2036(a); see also Estate of Bigelow v. Commissioner, 503 F.3d 955 (9th Cir. 2007), affg. T.C. Memo. 2005-65. A decedent's gross estate does not include the value of property transferred pursuant to a bona fide sale for adequate and full consideration. See sec. 2036(a); see also Estate of Bigelow v. Commissioner, supra at 963.

The estate contends that the values of the assets decedent transferred to RLP are not included in her gross estate under section 2036(a)(1) because she relinquished enjoyment of, and the right to the income from, the transferred assets, and alternatively, she transferred the assets to RLP in a bona fide sale for adequate and full consideration.[7] For the reasons

_____

[7] The estate further argues that sec. 2036(a), to the extent it applies to this case, applies only to decedent's transfer of the limited partner interests to her sons and not to her transfer of the assets to RLP. To this end, the estate asserts, decedent received 100 percent of the interests in RLP in exchange for the assets, which means that the value of decedent's gross estate was not depleted by that transfer but was depleted when decedent gave away the limited partner interests. See Estate of Magnin v. Commissioner, 184 F.3d 1074, 1079 (9th Cir. 1999) (stating that the "purpose underlying the section [2036(a)] is to prevent the depletion of the decedent's gross estate"), revg. on other grounds T.C. Memo. 1996-25. As detailed herein, we find on the basis of the credible evidence at hand that decedent's transfer of her assets to RLP and her ensuing gifts of the limited partner interests to her sons were part of a single plan to minimize decedent's Federal estate tax, lacked a significant nontax business purpose, and accomplished no genuine pooling of assets. On the basis of those findings, we reject this argument.

stated below, we reject both arguments. The record here, as did the record in Estate of Bigelow v. Commissioner, supra, supports the finding, which we make, that RLP was formed to facilitate the transfer of decedent's property to decedent's sons and grandchildren primarily as a testamentary substitute, with the aim of lowering the value of decedent's gross estate by applying discounts for lack of control and lack of marketability.

2.  Retained Interests

Under section 2036(a)(1), decedent's gross estate includes the fair market value of transferred assets to the extent that she retained possession or enjoyment of, or the right to income from, the assets for her life or for any other period that does not end before her death. In order not to have a retained interest described in section 2036(a)(1), decedent must have "absolutely, unequivocally, irrevocably, and without possible reservations," parted with all of her title, possession, and enjoyment of the transferred assets. See Commissioner v. Estate of Church, 335 U.S. 632, 645 (1949). Decedent will have retained such an interest if there was an express or implied agreement among the parties to the transfer at the time of transfer that the transferor retain the possession or enjoyment of, or the right to the income from, the transferred property. See Estate of Bigelow v. Commissioner, supra; Estate of Thompson v.

<u>Commissioner</u>, 382 F.3d 367, 375 (3d Cir. 2004), affg. T.C. Memo. 2002-246; <u>Estate of Maxwell v. Commissioner</u>, 3 F.3d 591, 594 (2d Cir. 1993), affg. 98 T.C. 594 (1992); <u>Estate of Reichardt v. Commissioner</u>, 114 T.C. 144, 151-152 (2000). Whether there was such an understanding or agreement is determined from all of the facts and circumstances surrounding both the transfer itself and the assets' subsequent use. See <u>Estate of Abraham v. Commissioner</u>, T.C. Memo. 2004-39, affd. 408 F.3d 26 (1st Cir. 2005). In the context of this case, the term "enjoyment" includes present economic benefits. See <u>Guynn v. United States</u>, 437 F.2d 1148, 1150 (4th Cir. 1971); <u>Estate of Reichardt v. Commissioner</u>, <u>supra</u> at 151.

The estate contends that there was neither an express nor an implied agreement for decedent to retain possession, enjoyment, or the right to income from the assets that she transferred to RLP. We disagree. We find on the basis of the credible evidence at hand that decedent and her sons had an implied understanding that decedent would retain enjoyment and the right to income from the transferred assets.[8]

The RLP agreement reflects an understanding among decedent and her sons that decedent would retain her interest in the

---

[8] Given this finding, we need not and do not decide whether they also had an express agreement that decedent would retain enjoyment and the right to income from the transferred assets.

transferred assets by virtue of her ability to control those assets, including the management and disposition thereof. Initially, as the direct general partner of RLP, decedent was given the right by the RLP partnership agreement to cause a distribution of RLP's net cashflow to RLP's partners in proportion to their partnership interests, and she was given the power "to do anything reasonably connected" with RLP's assets. Later, as an indirect (through the 1991 revocable trust) general partner of RLP, decedent continued to retain that right and power directly in that she was a cotrustee of the 1991 revocable trust and, most importantly, she had the absolute power to revoke the trust as if it had never been created in the first place. Thus, at all relevant times, decedent held both a majority interest in RLP and the powers incident to serving as RLP's general partner.

We also find as a fact that decedent and her sons agreed impliedly that the transferred assets and the income earned therefrom would continue to be used for decedent's pecuniary benefit. The transfer of practically all of decedent's wealth to RLP left decedent with insufficient liquid assets with which to pay her living expenses. The estate asserts that decedent's assets were sufficient because Trust B had a corpus of $2.5 million at the time of the transfer and decedent's sons, as cotrustees, could distribute Trust B's corpus to pay decedent's

expenses. The estate's argument is unavailing. When RLP was formed, decedent and her sons knew that decedent's annual income from Trust B, which for 1998 was $44,481, would be insufficient to cover decedent's annual expenses of approximately three times as much. Decedent had just become a full-time resident at the Hospital, where her residence resulted in medical costs totaling $71,788 for 1999, $78,114 for 2000, and $94,822 for 2001. Decedent and John Rector also directly drew over $77,000 in funds from RLP during 1999 to pay decedent's personal expenses. The estate attempts to downplay the significance of the direct use of RLP funds to pay decedent's personal expenses by attributing that use to "errors". In the light of John Rector's extensive financial expertise and his testimony that it never occurred to him that RLP should be reimbursed for such "errors" after they were discovered, we find that this argument lacks credibility.

We also note that the Trust B agreement allowed the cotrustees to pay to decedent amounts of trust principal necessary for her "care and comfortable support in * * * her accustomed manner of living". The implied understanding among decedent and her sons was that the assets of RLP would be readily used to meet decedent's expenses and that the corpus of Trust B would not be invaded. We conclude that the principal of Trust B was not available in any significant sense to decedent to pay her

living expenses.  In fact, decedent never even asked her sons to distribute Trust B principal to her when her monthly income was insufficient to cover her expenses; rather, decedent relied heavily on the assets she had transferred to RLP and the income earned therefrom.[9]

In sum, we conclude that decedent impliedly retained enjoyment of and the right to income from the assets that she transferred to RLP.  Decedent derived economic benefit from using RLP's assets to pay her living expenses, to meet her tax obligations, and to make gifts to her family members.  Such use of RLP's assets shows an agreement among decedent and her sons that decedent would retain the enjoyment of and the right to income from the transferred assets by withdrawing those assets and/or income from RLP at will.

3.  Bona Fide Sale for Adequate and Full Consideration

Under the exception to section 2036(a) contained in that section, a decedent's gross estate does not include the value of property transferred in "a bona fide sale for an adequate and

_____

[9] RLP transactions in 2002 and 2005 also illustrate the implied agreement among decedent and her sons that the transferred assets would continue to be used for the liabilities of decedent, even after her death.  In those years, an RLP credit line was used to pay decedent's Federal and State tax liabilities of $2,038,098 and $262,654, respectively.  A check also was written on the RLP credit line for $384,535 to pay some of decedent's Federal estate tax.

full consideration in money or money's worth".  The exception aims to exclude from the reach of Federal estate and gift taxes transfers in which a decedent received consideration sufficient to protect against depletion of the estate's assets.  See Estate of Magnin v. Commissioner, 184 F.3d 1074, 1079 (9th Cir. 1999), revg. on other grounds T.C. Memo. 1996-25.  The estate argues that the transfer of decedent's assets to RLP in exchange for the entire interest in RLP was a "bona fide sale" for which decedent received adequate and full consideration and, hence, that section 2036(a) does not apply here.  We disagree.  The transfer of decedent's assets to RLP in exchange for the entire interest in RLP was not "a bona fide sale for an adequate and full consideration" within the meaning of section 2036(a).

First, the formation of RLP entailed no change in the underlying pool of assets or the likelihood of profit.  Without such a change or a potential for profit, decedent's receipt of the partnership interests does not constitute the receipt of full and adequate consideration.  See Estate of Bongard v. Commissioner, 124 T.C. 95, 128-129 (2005); see also Estate of Bigelow v. Commissioner, 503 F.3d 955 (9th Cir. 2007).

Second, to constitute a bona fide sale for adequate and full consideration, decedent's transfer of the assets to RLP must have been made in good faith.  See sec. 20.2043-1(a), Estate Tax Regs.

For this purpose, good faith requires that the transfer be made for a legitimate and significant nontax business purpose. See Estate of Bongard v. Commissioner, supra at 118; Estate of Rosen v. Commissioner, T.C. Memo. 2006-115. A transaction between family members is subject to heightened scrutiny to ensure that the transaction is not a disguised gift. See Estate of Bigelow v. Commissioner, supra at 969; Harwood v. Commissioner, 82 T.C. 239, 258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986).

With respect to good faith in transactions between family members, this Court has considered whether "the terms of the transaction differed from those of two unrelated parties negotiating at arm's length." Estate of Bongard v. Commissioner, supra at 123. The parties' actions during the formation of RLP contrast starkly with those that would be anticipated from unrelated parties forming a limited partnership. Decedent and her sons did not negotiate the terms of the RLP agreement, and they did not retain independent counsel. Decedent (through her revocable trust) made all contributions to RLP, and her contributions constituted the vast bulk of her wealth. RLP was formed with decedent and her revocable trust as the only partners. RLP was not actually funded until nearly 3 months after it was formed. We also note that the RLP partnership

agreement contemplated that more than one partner would contribute property to RLP but that decedent and her sons never intended that anyone other than her (or her, through her revocable trust) would actually contribute property to RLP.

As to the need for a significant nontax business purpose, we inquire whether the transfer of assets to RLP was reasonably likely to serve such a purpose at its inception. See Strangi v. Commissioner, 417 F.3d 468, 480 (5th Cir. 2005), affg. T.C. Memo. 2003-145. The estate asserts that the motivation behind the formation of RLP was the desire to benefit from estate tax savings, the ability to give away partnership interests, the need to protect decedent's assets from her creditors, and the desire to diversify decedent's assets. We disagree with the estate that decedent had the requisite purpose when she transferred her assets to RLP. The estate's stated goal of gift-giving is a testamentary purpose and is not a significant nontax business purpose. See Estate of Bigelow v. Commissioner, supra; see also Estate of Schauerhamer v. Commissioner, T.C. Memo. 1997-242. Nor is the estate's stated goal of efficiently managing assets such a purpose, given the lack of evidence that RLP required any special kind of active management. See Estate of Bigelow v. Commissioner, supra. The protection of assets against creditors also is not such a purpose in that the record does not establish

any legitimate concern about the liabilities of decedent, nor did decedent's transfer of her assets to RLP actually protect the assets from her creditors in that she or her trust was at all times an RLP general partner. See id. The estate's stated claim to a diversification of assets also is not such a purpose in that RLP's ownership and management of the transferred assets was essentially identical to the 1991 revocable trust's pretransfer ownership and management of those assets. We also note that RLP had no investment strategy or business plan of providing added diversification of investments; rather, RLP held the securities transferred by decedent without any substantial change in investment strategy and did not engage in business transactions with anyone outside of the family.[10] See Estate of Thompson v. Commissioner, 382 F.3d at 378 (partnership lacked substantial nontax purpose under similar facts). Given these findings and conclusions, and our additional findings as to decedent's age and health at the time of RLP's formation, as well as the fact that only decedent's cash and marketable securities were contributed to RLP, we conclude that the formation of RLP was more consistent

---

[10] While the estate discerns a business purpose from the banking and securities investments of decedent's predeceased spouse and his parents, we find that family history to have no bearing on this case.

with an estate plan than an investment in a legitimate business.
Id. at 377; see also Estate of Rosen v. Commissioner, supra.

4.   Accuracy-Related Penalty Under Section 6662

Section 6662(a) and (b)(1) imposes an accuracy-related penalty equal to 20 percent of the portion of an underpayment which is attributable to negligence or disregard of rules or regulations.  The term "negligence" includes any failure to make a reasonable attempt to comply with the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return.  See sec. 1.6662-3(b)(1), Income Tax Regs.  The term "disregard" includes any careless, reckless, or intentional disregard of rules or regulations.  See sec. 6662(c).  Section 6664(c) provides that no penalty shall be imposed under section 6662 with respect to any portion of an underpayment if the taxpayer can show that the taxpayer acted with reasonable cause and in good faith.

Respondent determined that the estate was negligent in failing to report the $595,000 of prior gifts as adjusted taxable gifts on the estate's Federal estate tax return.  We agree.[11]

-----

[11] Neither party mentions the applicability of sec. 7491(c). That section provides that the Commissioner has the burden of production "in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title."  We need not decide whether sec. 7491(c) applies to estates because the record is sufficient to
                                              (continued...)

John Rector, who signed the return as coexecutor of the estate, had extensive expertise in financial matters.  He knew, or at least should have known, about the omission in his capacity as cotrustee of decedent's 1991 revocable trust, as coexecutor of decedent's estate, and most significantly as the donee of one-half of the $595,000.  The estate makes no showing of reasonable cause or good faith with respect to the omission.

_____

We have considered all arguments by petitioner for holdings contrary to those reached herein and find those agreements not discussed herein to be without merit.

Decision will be entered

under Rule 155.

_____

[11](...continued)
meet any burden of production respondent may have with respect to his determination of negligence.