T.C. Memo. 2013-234

UNITED STATES TAX COURT

ESTATE OF HELEN A. TROMBETTA, DECEASED, GAIL C. DOLE,
EXECUTRIX, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23892-10.                    Filed October 21, 2013.

<u>William E. Bonano</u> and <u>Richard M. Eigner</u>, for petitioner.

<u>Chong S. Hong</u> and <u>Rebecca S. Duewer-Grenville</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined a $6,464,225 deficiency in the

Federal estate tax of the Estate of Helen A. Trombetta (estate).  The issues for

decision are:  (1) whether the value of property transferred by Helen A. Trombetta

(decedent) to the Helen Trombetta Annuity Trust (annuity trust) is includable in

**[*2]** the gross estate pursuant to section 2036(a), 2038(a)(1), or 2035(a); (2) whether the value of property transferred by decedent to the Helen Trombetta Personal Residence Trust (residence trust) is includable in the gross estate pursuant to section 2036(a), 2038(a)(1), or 2035(a); (3) whether the estate is entitled to a deduction claimed for mortgages payable secured by annuity trust assets; and (4) whether the estate is entitled to a charitable contribution deduction.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Decedent resided in California at the time of her death. Gail C. Dole (G. Dole) was appointed executrix of the estate, and she resided in California at the time the petition was filed.

Decedent's Background

At a date not apparent from the record, decedent married Joseph Trombetta (J. Trombetta). Decedent and J. Trombetta had four children: Joan Adele Clendenin, Carol Ann Carroll (Carroll), G. Dole, and Thomas Leon Trombetta (T. Trombetta).

**[*3]**  During their marriage decedent and J. Trombetta owned various rental properties.  Decedent managed the day-to-day operation of the properties, including cleaning, painting, gardening, and collecting rent, while J. Trombetta managed the financial operation of the properties.  At a date not apparent from the record decedent reduced her property management obligations while J. Trombetta continued to purchase additional rental properties.

In 1986 decedent and J. Trombetta purchased an apartment building with 27 units known as Black Walnut Square (Black Walnut Square property).  In 1988 decedent and J. Trombetta purchased an apartment complex with 79 units known as Tierra Plaza (Tierra Plaza property).  Decedent and J. Trombetta purchased the Black Walnut Square and Tierra Plaza properties subject to significant debt, and they personally were liable on the mortgages secured by those properties.

Decedent and J. Trombetta subsequently decided to separate.  Following their separation decedent purchased a residential property in Modesto, California (Modesto property), for $249,000.

Decedent and J. Trombetta's marriage was dissolved by a judgment filed May 20, 1992.  Pursuant to the divorce judgment, decedent received various rental properties, including the Tierra Plaza and Black Walnut Square properties.  The divorce judgment provided that decedent would hold J. Trombetta harmless from

[*4] the liens and encumbrances attributable to the properties. At the time, the Tierra Plaza and Black Walnut Square properties were highly leveraged.

After her divorce decedent's primary assets were the various rental properties she received pursuant to the divorce judgment, as well as the Modesto property. Decedent primarily depended on the income from the Tierra Plaza and Black Walnut Square properties for her living expenses.

In 1992 decedent hired Richard M. Eigner, an attorney, and Paul E. Korte, a certified public accountant, to advise her regarding estate planning. In particular decedent requested that Eigner help her develop an estate plan that would allow her to: (1) maintain a cashflow of approximately $10,000 per month; (2) establish a cash reserve of $100,000 for emergencies; (3) reduce her personal involvement in managing the rental properties; (4) reduce her financial risk; and (5) provide for the benefit of her children while minimizing any estate and gift tax consequences.

To achieve these objectives, decedent and Eigner developed a comprehensive and integrated estate plan. In August 1993, at the age of 72, decedent executed a will and created the Helen Trombetta Living Trust, the annuity trust, and the residence trust. She also formed a limited partnership, Helen Properties L.P. (Helen Properties), and transferred to Helen Properties her interests

**[*5]** in all of the rental properties except the Tierra Plaza and Black Walnut Square properties.

Annuity Trust

Decedent was the grantor of the annuity trust and its sole beneficiary. Decedent, Carroll, G. Dole, and T. Trombetta were the cotrustees. Decedent was vested with 50% of the annuity trust voting rights, and the other cotrustees split the remaining voting rights. The annuity trust agreement provided that "[d]ecisions of the trustees may be taken by majority vote of all trustees". (Emphasis added.)

The annuity trust agreement provided for an annuity term of 180 months subject to decedent's power to reduce the term. During the annuity term the trustees would distribute to decedent, at quarterly or more frequent intervals, an annual sum of $75,000 for the first 12-month period of the annuity term, with a 4% increase at the beginning of each successive 12-month period (periodic payments). After termination of the annuity trust term the annuity trust was prohibited from making any distributions to decedent.

Carroll, G. Dole, and T. Trombetta, as cotrustees, agreed that they would be jointly and severally liable for any periodic payment in the event that the annuity trust lacked sufficient funds to make such payment. However, if the annuity trust

**[\*6]** income exceeded the periodic payment due, the annuity trust agreement provided that the cotrustees could distribute the excess income to decedent or allow the income to accumulate in the trust. At the later of the end of the annuity trust term or the date of decedent's death, the annuity trust property would pass to decedent's surviving children or grandchildren.

The annuity trust agreement anticipated decedent's transfers to the trust of the Tierra Plaza and Black Walnut Square properties. The agreement provided that the cotrustees were entitled to "manage, control, lease, grant options on, mortgage, sell, convey, exchange, partition, divide, subdivide, improve, change the character of, develop, repair, abandon and demolish trust property." The cotrustees could employ individuals as property managers or custodians to assist with administration of the trust property. The annuity trust agreement also provided that decedent intended her retained interest in the properties to qualify as a qualified interest under section 2702(b)(1).

Decedent subsequently transferred to the annuity trust the Tierra Plaza and Black Walnut Square properties. At the time of the transfers, the Tierra Plaza property was security for aggregate indebtedness of approximately $2,020,000, the Black Walnut Square property was security for indebtedness of approximately $884,000, and decedent had an adjusted basis in the properties of $1,302,941.

[*7] Following decedent's transfers of the properties to the annuity trust the annuity trust paid the interest and principal owed on the indebtedness, although the annuity trust never assumed the mortgages secured by the properties.

Decedent's transfers of the properties were the only transfers to the annuity trust. The annuity trust agreement prohibited any additional contributions of property to the annuity trust.

Decedent reported the transfers of the properties to the annuity trust on her Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for 1993. On an attached schedule decedent reported that the properties had a net value of $1,425,802, that she had a retained interest of $921,809, and that she had made a gift of $503,993, the remaining value.

Residence Trust

Decedent was grantor, trustee, and the sole beneficiary of the residence trust. The residence trust agreement provided that decedent had the right to use any trust property as a personal residence and the right to receive the net income from the trust. The only limitation on decedent's right to use the trust property was the residence trust term. The term of the trust was 180 months, subject to decedent's power to reduce the term. The residence trust agreement further

**[*8]** provided that decedent intended the residence trust to qualify as a qualified personal residence trust under section 2702.

Upon termination of the residence trust term decedent or her estate would receive the trust property and any accrued income. If decedent was living at termination, the trust property would be distributed equally to her children or their children. If decedent was deceased at termination, the trustee would distribute the balance of the trust property as directed by decedent's will or, if not so directed, equally to decedent's children or their children.

Decedent subsequently transferred the Modesto property to the residence trust. At the time of the transfer, decedent had an adjusted basis in the Modesto property of $399,637. Decedent's transfer of the Modesto property was the only transfer to the residence trust.

On her Form 709 for 1993 decedent reported the transfer of the Modesto property to the residence trust. On an attached schedule decedent reported that the Modesto property had a net worth of $150,000, that she had a retained interest of $92,491, and that she had made a gift of $57,509, the remaining value.

[*9] Subsequent Events

On August 1, 1993, decedent received from the annuity trust her first periodic payment of $6,250 and she continued to receive monthly periodic payments of $6,250 during 1993.

In August 1993 decedent, along with her son-in-law M. Dole, began negotiating with different banks to refinance the Tierra Plaza property. On October 22, 1993, decedent, in her individual capacity, executed deeds of trust regarding the Tierra Plaza property in favor of Stockton Savings Bank and Brentwood Bank of California. Decedent executed the deeds to obtain a more favorable interest rate with respect to the mortgages on the Tierra Plaza property. Decedent personally was liable for the mortgages on the Tierra Plaza property.

On August 1, 1994, decedent received from the annuity trust a periodic payment of $6,500, reflecting a 4% increase over prior payments. Decedent subsequently decided that she would prefer to receive a lower payment amount "with the understanding that the deferred amounts would accrue interest and be paid later to [d]ecedent or her estate along with the accrued interest". Accordingly, on September 1, 1994, decedent received a periodic payment of $6,250, and the annuity trust began recording the amount of the shortage and calculating a balance due to decedent equal to the amount of the shortage plus 6%

[*10] interest. All of decedent's payments through April 1, 1997, were in amounts less than the scheduled amounts, with the exception of four periodic payments that were in amounts in excess of the scheduled amounts.

On May 1, 1997, decedent received a periodic payment in excess of the scheduled payment amount, eliminating the balance due to decedent but creating a an outstanding balance due to the annuity trust. Decedent continued to receive periodic payments in amounts in excess of the scheduled amount through April 1, 1998. Beginning on May 1, 1998, the annuity trust made periodic payments in amounts less than the scheduled amounts, with the exception of a $17,311.62 payment made December 1, 1998. Despite the decreased payment amounts, decedent continued to have an outstanding balance due to the annuity trust.

Decedent subsequently considered selling the Tierra Plaza and Black Walnut Square properties. Decedent wanted to extricate herself from her property management obligations and ensure continued funding of the annuity trust. Korte advised decedent that a sale of the properties would result in substantial Federal taxes that would reduce the value of the annuity trust corpus.

To preserve the value of the annuity trust corpus, in April 1999, at decedent's direction, the annuity trust entered into a residential lease and option with the Doles with respect to the Tierra Plaza and Black Walnut Square

[*11] properties. The lease provided for a term of 34 years beginning April 1, 1999. With respect to the Tierra Plaza property, the lease provided for a monthly rent of $21,827.58 and an option price of $3,300,000. With respect to the Black Walnut Square property, the lease provided for a monthly rent of $7,275.88 and an option price of $1,100,000. The monthly rent payments provided the annuity trust with sufficient income to make the periodic payments to decedent.

On January 1, 2001, the annuity trust made a periodic payment to decedent of $7,311.62, an amount less than the scheduled amount. After this periodic payment decedent no longer had an outstanding balance due to the annuity trust; however, the annuity trust again began to accrue a balance due to decedent. The annuity trust made periodic payments in amounts less than the scheduled amounts for the remainder of the annuity trust term because decedent had determined that she did not need the full scheduled amount for her living expenses.

In December 2001 the annuity trust paid off the mortgage secured by the Black Walnut property. On December 15, 2001, decedent, on behalf of the annuity trust, issued a promissory note to Helen Properties. Under the terms of the promissory note Helen Properties would lend decedent and the annuity trust $721,801.27, to be repaid in monthly installments beginning January 15, 2002.

[*12] The promissory note was secured by the Tierra Plaza and Black Walnut Square properties. Decedent personally was liable for the promissory note.

In March 2005 decedent was diagnosed with cancer. In or about 2006 an intrafamily dispute developed between T. Trombetta on the one hand and decedent and the Doles on the other. In April 2006 decedent responded to T. Trombetta's attempts to take control of the family affairs by asserting to her son that she was still able to make any and all decisions for herself. She remained mentally alert and in firm control of her affairs through the last month of her life.

Because decedent believed that she would not live until the termination of the annuity and resident trust terms, in August 2006 she amended the annuity and residence trust agreements as well as her will. Decedent reduced the number of months of the annuity trust term to 156, thereby providing for the annuity trust term to terminate on July 31, 2006. She also provided more specific instructions regarding the division of the annuity trust income and corpus following her death.

Decedent reduced the number of months of the residence trust term to "that number of months (not greater than 180) that is determined by making the month during which the * * * [decedent] dies the last month preceding the Termination Date." Thus, under the terms of the August 2006 amendment, the residence trust would terminate after decedent died. Decedent amended her will and the

[*13] residence trust agreement to create a "charitable remainder unitary trust". She amended the residence trust agreement to instruct the trustee to transfer the Modesto property after her death to a "charitable remainder unitary trust" for a term of years with "a unitary payout percentage that will target the present value (as determined under applicable Regulations) of the interests of the charitable beneficiaries to and among whom the [charitable remainder unitary trust's] corpus is to be distribution [sic] following the [charitable remainder unitary trust's] term of years to equal about $250,000." Decedent provided that her estate would be the sole beneficiary entitled to the unitrust payments during the term of years. Decedent intended that the "charitable remainder unitary trust" would allow her estate a charitable contribution deduction of $250,000.

Decedent died on September 16, 2006. At the time, she was using the Modesto property as her personal residence. On decedent's date of death the aggregate mortgage indebtedness secured by the Tierra Plaza property was $2,194,245.50, and the leased fee value of the Tierra Plaza and Black Walnut Square properties was $4,300,000.

Following decedent's death the annuity trust had a balance due to decedent of $121,979.28. On September 18, 2006, the annuity trust paid $50,000 to decedent's estate. On November 13, 2006, the annuity trust paid $72,682.05 to

[*14] decedent's estate. After the November payment the balance due to decedent's estate was zero.

On December 18, 2006, G. Dole, as trustee of the residence trust, created the Helen Trombetta Charitable Remainder Unitrust (charitable remainder unitrust). The charitable remainder unitrust agreement provided that the charitable remainder unitrust would pay decedent's estate an annual payment equal to 19.9105% of the fair market value (FMV) of the trust assets, valued as of the first day of each taxable year, for a five-year term beginning September 16, 2006. At the termination of the trust term the trustee would distribute the principal and income of the trust to one or more charitable organizations. G. Dole subsequently transferred the Modesto property to the charitable remainder unitrust.

On January 5, 2007, the Modesto property was sold to an unrelated buyer for $750,020, resulting in net proceeds of $707,630.41.

On August 29, 2007, G. Dole filed a petition for reformation of decedent's amendment to the residence trust, with the Superior Court of California, County of Stanislaus (superior court). In the petition G. Dole indicated that decedent's intent in amending the residence trust agreement was to remove the assets of that trust from her estate, which could only be accomplished by terminating the residence trust before she died. However, decedent erroneously amended the residence trust

[*15] agreement to provide that the trust would terminate after the month during which decedent died. G. Dole requested that the amendment be altered to provide that the residence trust term would instead end on the last day of the month before the month during which decedent died. On October 3, 2007, the superior court entered a reformation order that effectively terminated the residence trust as of August 31, 2006.

During 2011 the charitable remainder trust contributed $344,000 to qualified charitable organizations.

Tax Reporting and the Notice of Deficiency

On September 28, 2007, the estate filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return. The estate reported a total value for the gross estate of $1,814,423. On an attached Schedule F, Other Miscellaneous Property, the estate reported a balance due with respect to the periodic payments of $104,212 and related interest of $17,767. On an attached Schedule G, Transfers During Decedent's Life, the estate reported that in 1993 decedent had transferred to the annuity trust the Tierra Plaza and Black Walnut Square properties, valued $1,050,156 and $375,646, respectively, and that the net value of the transferred future interests was $503,993. The estate also reported that: (1) decedent had relinquished her right to receive periodic payments from

[*16] the annuity trust for the final two years of the annuity trust term; (2) the total amount of the scheduled periodic payments for those years was $254,756; and (3) the present value of the relinquished periodic payments was $232,226. On the Schedule G the estate reported that in 1993 decedent had transferred to the residence trust the Modesto property valued at $150,000 and that the net value of the transferred future interest was $57,509.

In August 2010 decedent's estate filed an informal claim for refund. In the claim for refund decedent's estate claimed a charitable contribution deduction of $250,000 and a deduction for mortgages payable of $2,195,272.

In a notice of deficiency dated September 14, 2010, respondent determined that the estate had failed to report transfers during decedent's life of $14,365,823. Respondent determined that the FMV of the Tierra Plaza and Black Walnut Square properties as of decedent's date of death was $14,177,325. Respondent determined that the FMV of the Modesto property as of decedent's date of death was $750,000. Respondent disallowed the estate's claimed deductions for charitable contributions and mortgages payable.

**[*17]**                                        OPINION

Preliminary Matters

Generally, under section 7491(a), if a taxpayer introduces credible evidence with respect to any factual issue, the burden of proof is shifted to the Commissioner.  The burden shifts, however, only when the taxpayer has maintained all records and has cooperated with reasonable requests by the Commissioner for witnesses, information, documents, meetings, and interviews. Sec. 7491(a)(2)(B); see Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

The parties dispute whether the burden shifts to respondent under section 7491(a).  A prolonged discussion of burden of proof is unnecessary because we decide this case on the preponderance of the evidence.  See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008) ("In a case where the standard of proof is preponderance of the evidence and the preponderance of the evidence favors one party, we may decide the case on the weight of the evidence and not on an allocation of the burden of proof."); see also Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66, aff'd, 431 Fed. Appx. 544 (9th Cir. 2011).

As another preliminary matter, we note that the parties' briefs in this case failed to comply with Rule 151(e)(3), which directs that a party's proposed findings "shall consist of a concise statement of essential fact and not a recital of

**[*18]** <u>testimony</u> nor a discussion or argument relating to the evidence or the law" and shall include "references to the pages of the transcript or the exhibits or other sources relied upon to support the statement." (Emphasis added.)

Some of the parties' proposed findings, including significant findings concerning cash balances in estate bank accounts as of decedent's date of death, are not supported by either the exhibits or the testimony cited. As a result, many of the proposed findings have not been adopted. Although the stipulations are extensive, we have confined our factual findings to those material to the resolution of the issues for decision. The parties will bear the burden of extracting from the stipulated exhibits information necessary to the computations for the decision to be entered in this case pursuant to Rule 155.

<u>Includability of Assets in Decedent's Gross Estate</u>

Section 2051 defines the term "taxable estate" as "the value of the gross estate", less applicable deductions. Section 2033 broadly states that "[t]he value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Sections 2034 through 2045 then explicitly mandate inclusion of several more narrowly defined classes of assets.

[*19] For example, section 2036(a) provides:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

The general purpose of section 2036(a) is to include in a decedent's gross estate transfers of property that are "'essentially testamentary' in nature." Ray v. United States, 762 F.2d 1361, 1362 (9th Cir. 1985) (quoting United States v. Estate of Grace, 395 U.S. 316, 320 (1969)). Testamentary transfers are those "transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime." Estate of Grace, 395 U.S. at 320.

Section 2036(a) includes the value of assets in a decedent's gross estate when: (1) decedent made an inter vivos transfer of property; (2) decedent's transfer was not a bona fide sale for adequate and full consideration; and (3)

[*20] decedent retained an interest or right in the transferred property that she did not relinquish before her death. See Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005). In addition, section 2035(a) provides that a decedent's gross estate includes the value of any property with respect to which the decedent made a transfer or relinquished a power within three years of her death if the value of such property would have been included in her estate under section 2036 but for her transfer of an interest in the property or her relinquishment of a power with respect to the property.

Annuity Trust

Respondent contends that decedent's gross estate must include the values of the Tierra Plaza and Black Walnut Square properties pursuant to section 2036(a). Petitioner does not contest that decedent made inter vivos transfers of property to the annuity trust. Rather petitioner contends that section 2036(a) is inapplicable because: (1) decedent's transfers of the Black Walnut Square and Tierra Plaza properties were bona fide sales for adequate and full consideration; or (2) decedent did not retain during her life an interest in the transferred properties. We address each of petitioner's arguments in turn.

**[*21]** <u>Bona Fide Sale Exception</u>

Section 2036(a) does not apply if the transfer of property was part of a bona fide sale in exchange for full and adequate consideration. A bona fide sale is an arm's-length business transaction between a willing buyer and a willing seller. <u>Estate of Reichardt v. Commissioner</u>, 114 T.C. 144, 155 (2000). Availability of the exception rests on two requirements: (1) a bona fide sale, meaning an arm's-length transaction, and (2) full and adequate consideration. <u>See</u> <u>Estate of Harper v. Commissioner</u>, T.C. Memo. 2002-121. The situation before us meets neither of these criteria.

First, decedent did not receive full and adequate consideration for the transfers of the rental properties. Decedent received an interest reducible to money value, i.e., the present value of the periodic payments. However, decedent and Eigner structured the annuity trust as a grantor trust, and decedent reported the difference between the then present value of the periodic payments and the FMV of the Tierra Plaza and Black Walnut Square properties as a gift on her Form 709 for 1993. Decedent's structuring of the annuity trust and subsequent tax reporting supports a finding that she did not transfer the properties to the trust in exchange for full and adequate consideration.

**[*22]** Second, no bona fide sale, in the sense of an arm's-length transaction, occurred in connection with decedent's transfers of the properties to the annuity trust. Eigner prepared the annuity trust agreement in the absence of any meaningful negotiation or bargaining with the other anticipated cotrustees or future beneficiaries. Eigner and decedent determined how the entire estate plan would be structured and operated and what property would be contributed to which vehicle. Decedent, as the sole beneficiary and the sole transferor, formed the transaction, fully funded the annuity trust, and essentially stood on both sides of the transaction.

Petitioner nonetheless contends that decedent's transfers of the properties to the annuity trust satisfy the bona fide sale exception because, according to petitioner, decedent had clear nontax purposes for the transfers. In particular petitioner contends that decedent's purpose in transferring the properties was to relieve herself of the burden of managing the properties and to receive an assured income. Petitioner urges us to adopt the standard set forth in Estate of Bigelow v. Commissioner, 503 F.3d 955, 969 (9th Cir. 2007), aff'g T.C. Memo. 2005-65, for evaluating whether a decedent transferred an asset to a family member as part of a bona fide sale.

**[\*23]**   In Estate of Bigelow v. Commissioner, 503 F.3d at 968-969, the U.S. Court of Appeals for the Ninth Circuit analyzed the decedent's reasons for transferring property to a family limited partnership.  The court stated that when a decedent transfers property to a family limited partnership, "[t]he crux of the bona fide transfer inquiry is whether the taxpayer can demonstrate that the transfer had 'legitimate and significant nontax reasons.'"  Id. (quoting Estate of Bongard v. Commissioner, 124 T.C. at 123).  If the taxpayer can demonstrate that the decedent had legitimate and significant nontax reasons for the transfer, the bona fide sale exception is satisfied.  Id.  The court also noted that intrafamily transfers are subject to heightened scrutiny.  Id.

Although a number of other cases have applied the "legitimate and significant nontax reasons" standard to determine whether a bona fide sale exception was satisfied, all of the cases applied the standard in the context of a transfer to a family limited partnership.  See, e.g., Estate of Black v. Commissioner, 133 T.C. 340, 362 (2009); Estate of Bongard v. Commissioner, 124 T.C. at 118-119; Estate of Stone v. Commissioner, T.C. Memo. 2012-48; Estate of Turner v. Commissioner, T.C. Memo. 2011-209.  Decedent transferred the Tierra Plaza and Black Walnut Square properties to a grantor trust, not a family limited partnership.  Decedent's transfers are not comparable to a transfer

**[\*24]** to a family limited partnership, particularly given that no other individual received a present interest in the annuity trust. We are not persuaded and are unable to find that decedent's transfers to the annuity trust are sufficiently similar to a transfer to a family limited partnership to apply the "legitimate and significant nontax reasons" standard.

Furthermore, even if we were to find that the "legitimate and significant nontax reasons" standard was applicable, the evidence does not establish that decedent had substantial nontax reasons for transferring the properties to the annuity trust. With respect to decedent's desire to reduce her property management obligations, the annuity trust agreement provided that all of the cotrustees could manage the properties and did not exclude decedent from the right or obligation of managing the properties. In fact, decedent continued to participate in managing the properties even after she established the annuity trust. With respect to decedent's desire to receive an assured income, the record shows that Eigner and decedent structured the annuity trust to provide for periodic payments to decedent at least in part because of the beneficial tax treatment of such an arrangement as opposed to an alternative arrangement, such as a sale of the properties or transfers of the properties to Helen Properties.

**[*25]** Decedent undisputedly transferred the rental properties to the annuity trust as part of her overall estate plan. Decedent transferred her assets to the annuity trust at age 72, and at the same time she executed her will. See, e.g., Estate of Rosen v. Commissioner, T.C. Memo. 2006-115, slip op. at 44. Decedent had significant stated tax reasons for creating the annuity trust. While decedent's creation of the annuity trust accomplished some nontax objectives, we are unable to find that, when viewed in totality, those nontax objectives were significant. Accordingly, the transfers do not qualify under the bona fide sale exception.

Retained Interest

Whether a decedent retained an interest in transferred property depends upon whether "there is an express or implied agreement at the time of transfer that the transferor will retain lifetime possession or enjoyment of, or right to income from, the transferred property." Estate of Thompson v. Commissioner, 382 F.3d 367, 375 (3d Cir. 2004), aff'g T.C. Memo. 2002-246. To avoid characterization as a retained interest, the decedent must have "absolutely, unequivocally, irrevocably, and without possible reservations" parted with all of her title, possession, and enjoyment of the transferred assets. Commissioner v. Estate of Church, 335 U.S. 632, 645 (1949).

**[\*26]**  As used in section 2036(a)(1), the term "enjoyment" has been described as "synonymous with substantial present economic benefit."  Estate of McNichol v. Commissioner, 265 F.2d 667, 671 (3d Cir. 1959), aff'g 29 T.C. 1179 (1958); see also Estate of Reichardt v. Commissioner, 114 T.C. at 151.  Regulations additionally provide that use, possession, right to income, or other enjoyment of transferred property is considered as having been retained or reserved "to the extent that the use, possession, right to the income, or other enjoyment is to be applied toward the discharge of a legal obligation of the decedent, or otherwise for his pecuniary benefit."  Sec. 20.2036-1(b)(2), Estate Tax Regs.  Enjoyment of the transferred property is retained for purposes of section 2036(a)(1) if there is an express or implied understanding among the parties at the time of the transfer, even if the retained interest is not legally enforceable.  See Estate of Rapelje v. Commissioner, 73 T.C. 82, 86 (1979); Estate of Turner v. Commissioner, T.C. Memo. 2011-209.

As used in section 2036(a), the term "right" has been described as "an ascertainable and legally enforceable power".  United States v. Byrum, 408 U.S. 125, 136 (1972).  Section 20.2036-1(b)(3), Estate Tax Regs., provides:

> With respect to such a power, it is immaterial (i) whether the power was exercisable alone or only in conjunction with another person or persons, whether or not having an adverse interest; (ii) in what

**[\*27]** capacity the power was exercisable by the decedent or by another person or persons in conjunction with the decedent; and (iii) whether the exercise of the power was subject to a contingency beyond the decedent's control which did not occur before his death * * *. The phrase, however, does not include a power over the transferred property itself which does not affect the enjoyment of the income received or earned during the decedent's life. * * *

However, the decedent's retention of the right to exercise managerial power over the transferred property does not in and of itself result in inclusion under section 2036(a). Byrum, 408 U.S. at 132-134.

We consider all the facts and circumstances surrounding the transfer and the subsequent use of the property in deciding whether there was an implied agreement. See Estate of Thompson v. Commissioner, 382 F.3d at 376. In assessing whether a decedent impliedly retained the right to possession or enjoyment of the assets, we previously have considered factors such as the use of the transferred assets to pay the decedent's personal expenses, the decedent's relationship to the assets before and after the transfer, "commingling of funds, a history of disproportionate distributions, testamentary characteristics of the arrangement, the extent to which the decedent transferred nearly all of his or her assets, the unilateral formation of the partnership, the type of assets transferred, and the personal situation of the decedent." Estate of Erickson v. Commissioner,

**[\*28]** T.C. Memo. 2007-107, slip op. at 20; see Estate of Hurford v. Commissioner, T.C. Memo. 2008-278, slip op. at 73.

M. Dole testified that, before her death, decedent made all decisions with respect to the Tierra Plaza and Black Walnut Square properties and that the cotrustees generally acted on decedent's recommendation.  He testified further that decedent took the lead role in negotiating the refinancing of the properties following their transfer to the annuity trust.  Decedent alone retained signatory authority with respect to the disposition of the properties, as shown by the residential lease option and promissory note decedent executed with respect to the properties.  Decedent thus retained de facto control over the properties and their disposition.  See, e.g., Estate of Thompson v. Commissioner, 382 F.3d 367; Estate of Reichardt v. Commissioner, 114 T.C. at 152.

In addition, the annuity trust agreement provided that any additional income could be distributed to decedent at the direction of the trustees.  Decedent retained 50% of the voting rights, and the remaining voting rights were divided among her children.  Because decedent and her children could make distributions of additional income to decedent when and in the amount they pleased, decedent maintained the same enjoyment of the properties and their income stream as she had before she transferred the properties to the annuity trust.  See, e.g.,

[*29] Estate of Thompson v. Commissioner, 382 F.3d 367; Estate of Rosen v. Commissioner, slip op. at 50-51; see also sec. 20.2036-1(b)(3), Estate Tax Regs. Decedent also received an additional economic benefit in that the annuity trust, on behalf of decedent, applied the income from the transferred properties to the discharge of her loan obligations with respect to those properties. See Estate of Bigelow v. Commissioner, 503 F.3d at 965; Strangi v. Commissioner, 417 F.3d 468, 477 (5th Cir. 2005), aff'g T.C. Memo. 2003-145; Estate of Malkin v. Commissioner, T.C. Memo. 2009-212.

Finally, decedent transferred the properties to the annuity trust on the advice of Eigner and Korte to minimize the tax consequences of passing her estate to her descendants. See, e.g., Estate of Rosen v. Commissioner, slip op. at 52. Decedent's motivations, the testamentary character of the annuity trust, and the actions taken with respect to the annuity trust are "more consistent with an estate plan than an investment in a legitimate business." Estate of Thompson v. Commissioner, 382 F.3d at 377.

Given decedent's continued control over the transferred properties, her right to the excess income from the properties, and the use of the income from the properties to discharge her personal legal obligations, we are unable to find that decedent "absolutely, unequivocally, irrevocably, and without possible

[*30] reservations" parted with all of her title, possession, and enjoyment of the transferred properties. Commissioner v. Estate of Church, 335 U.S. at 645. We conclude that decedent retained an interest in the entirety of the transferred properties.

Petitioner nonetheless contends that decedent did not have a retained interest in the transferred properties because decedent received only the right to the specific periodic payments, computed without regard to the annuity trust's income. Petitioner argues that decedent retained an interest in only the periodic payments rather than the entirety of the transferred properties. In so arguing, petitioner characterizes decedent's transfer of the Tierra Plaza and Black Walnut Square properties as a sale in exchange for an annuity rather than a transfer with a retained interest.

The U.S. Court of Appeals for the Ninth Circuit has set forth standards to aid in deciding whether a decedent's transfer of property to a trust in exchange for an annuity constitutes a retained interest or a sale in exchange for an annuity. Ray, 762 F.2d at 1363. The Court of Appeals stated that a retained interest existed where:

> (1) the property the taxpayers transferred to the trust was, in effect, the only source for their "annuity" payments; (2) since the trust's income was designed to equal the annual payments to the taxpayers,

[*31] the "annuity" payments would not be paid from the trust corpus; and (3) the trust corpus would be available for "ultimate distribution to the trust beneficiaries."

Id. (citing Lazarus v. Commissioner, 513 F.2d 824, 829 (9th Cir. 1975), aff'g 58 T.C. 854 (1972)). By contrast, a sale in exchange for an annuity occurred where the parties structured the transaction as an annuity obligation, the amount of the annuity did not bear a mathematical relationship to the trust income, the transferor did not control the property transferred, and the trust corpus was used to pay the annuity rather than simply providing for annuity payments as a conduit for the trust income. Id. The court concluded that the decedent's interests in the property after the transfer constituted a retained interest under section 2036(a). Id. The court further concluded that the taxpayer's reliance on Fid.-Phila. Trust Co. v. Smith, 356 U.S. 274, 280 n.8 (1958), was misplaced because the payments at issue "were chargeable solely to the transferred property and income therefrom; they were not personal obligations of the trustee." Ray, 762 F.2d at 1364.

While decedent formally structured the transaction as an annuity obligation and did not calculate the amount of the periodic payments as a percentage of the annuity trust income, these facts alone are an insufficient basis upon which to rest a conclusion that decedent sold the properties to the trust in exchange for an annuity. The record shows that decedent's transfer was more akin to a transfer

[*32] with a retained interest than to a sale in exchange for an annuity. Decedent continued to control the transferred properties. See supra pp. 24-29. The transferred properties were the only source for the funds for the periodic payments, and decedent intended that the periodic payments would be made from the annuity trust's income rather than the trust corpus, as evidenced by her refusal to sell the properties after learning that such sale would invade the trust corpus. The trust corpus was never used to make any part of the periodic payments and therefore was available and intended for distribution to the ultimate trust beneficiaries, i.e., decedent's children and grandchildren. The periodic payments simply were a "conduit" for payment to decedent of the income from the Tierra Plaza and Black Walnut Square properties.

As in Ray, petitioner's reliance on Fid.-Phila. Trust Co., 356 U.S. at 280 n.8, is misplaced. Although the cotrustees agreed to advance funds to the annuity trust if the income and assets were insufficient to fund decedent's periodic payments, the record shows that the cotrustees were never required to advance any money and that decedent intended the annuity trust to make the periodic payments using the income generated by the properties rather than any contributions of the cotrustees. In fact, the periodic payments were funded with only the income from the transferred properties.

[*33] Petitioner's argument presupposes that we find that decedent had a retained interest in the periodic payments only; however, as discussed supra, we have concluded that decedent had a retained interest in the entirety of the transferred properties rather than just an interest in the periodic payments. Furthermore, decedent did not receive only the right to specified payments under the annuity trust agreement. In addition to decedent's authority to distribute to herself any excess annuity trust income, decedent had the authority, and exercised the authority, to increase or decrease the periodic payment amount at her discretion, despite provisions in the annuity trust specifying a certain amount.

While the amount of the payment was not tied to the income of the annuity trust, the annuity trust was funded with decedent's assets only, and the annuity trust used these assets to produce sufficient income to fund the required periodic payments. See, e.g., Estate of Hurford v. Commissioner, slip op. at 58-59. While the cotrustees agreed to advance funds to the annuity trust if needed, the cotrustees never actually advanced any such funds and the structure of the annuity trust made it unlikely that the cotrustees would ever have to advance such funds. Accordingly, we reject petitioner's argument that decedent's retained interest was limited to an interest in only the periodic payments.

**[*34]** Alternatively, petitioner contends that decedent did not have a retained interest in the transferred properties because California law limited decedent's authority to distribute any excess trust income to herself. In support of this argument petitioner cites the following California statutory provision:

> Unless a settlor or a testator clearly indicates that a broader power is intended by express reference to this subdivision, a person who is a beneficiary of a trust that permits the person, as trustee or cotrustee, to make discretionary distributions of income or principal to or for the benefit of himself or herself may exercise that power in his or her favor only for his or her health, education, support, or maintenance within the meaning of Sections 2041 and 2514 of the Internal Revenue Code. * * *

Cal. Prob. Code sec. 16081(c) (West 2011).

Although California law limited decedent's authority to distribute excess income to herself, it did not extinguish that authority. In fact, Cal. Prob. Code sec. 16081(c) provides an ascertainable standard for distributing the excess income that is fairly broad. Petitioner failed to cite, and we have not found, any case in which a court has held that a State statute that limited the decedent's authority to distribute income attributable to transferred property rendered that authority irrelevant in considering whether the decedent had retained a right to the income of the transferred property. We therefore reject petitioner's argument.

[*35] We conclude that there was an implied agreement between decedent and the cotrustees at the time of the transfer of the properties to the annuity trust that decedent would retain enjoyment and economic benefit of the transferred properties. Decedent retained such enjoyment and economic benefit during her lifetime. Contrary to petitioner's assertion, decedent did not retain an interest in the periodic payments only but rather she retained an interest in the entirety of the transferred properties. Accordingly, decedent had a retained interest in the transferred properties under section 2036(a).

Section 2035

We now must consider whether decedent's action in reducing the annuity trust term in August 2006 constituted a transfer of an interest in or relinquishment of a right with respect to the properties and, if so, whether section 2035 operates to include the transferred properties in decedent's gross estate notwithstanding such action. Petitioner contends that decedent's reduction of the annuity trust term constituted an exercise of power rather than a relinquishment of power and, consequently, the transferred properties are not includible in decedent's gross estate. Respondent contends that decedent's reduction of the annuity trust term was a relinquishment of power because in so doing, she transferred the complete present enjoyment of the annuity trust corpus and income to the remaindermen.

**[*36]** Section 2035(a) provides for the inclusion in a decedent's gross estate of the value of such property that would have been includable under sections 2036 or 2038 but for the decedent's relinquishment of a power with respect to that property during a three-year period ending on the date of the decedent's death. In Estate of Jalkut v. Commissioner, 96 T.C. 675, 685 (1991), this Court analyzed whether either of two sets of transfers constituted a relinquishment by the decedent of his power to alter, amend, revoke, or terminate the trust under section 2038.

In 1984 decedent Jalkut, as trustee, made gift transfers to six donees. Id. The Court concluded that the decedent made these transfers pursuant to his power to withdraw income and principal from the trust and therefore the gift transfers constituted an exercise of the decedent's power. Id.; see also McNeely v. United States, 16 F.3d 303, 305 (8th Cir. 1994) (holding that the decedent exercised rather than relinquished her power with respect to the trust when she made distributions to individuals pursuant to her power to invade the trust corpus at will); Estate of Frank v. Commissioner, T.C. Memo. 1995-132; Estate of Barton v. Commissioner, T.C. Memo. 1993-583. By contrast, in 1985 the decedent was incapacitated and the remaining trustees distributed income and principal from the trust to the decedent and his descendants. Estate of Jalkut v. Commissioner, 96

[*37] T.C. at 685. The Court concluded that the transfers constituted "a relinquishment by the decedent, through the trustees, of his power to alter, amend, revoke or terminate the trust with respect to the transferred assets". Id.; see also White v. United States, 881 F. Supp. 688, 694-695 (D. Mass. 1995).

As discussed supra, decedent here retained an interest in the transferred properties, including the right to control the properties, distribute excess income from the properties, and use income from the properties to satisfy her personal loan obligations. Contradicting petitioner's argument, decedent's retained interest was not limited to her interest in the periodic payments; and even if she had exercised, rather than relinquished, a power with respect to the periodic payments, she still retained an interest in the transferred properties on the basis of her other rights with respect to the properties.

When decedent reduced the annuity trust term she relinquished her right to the periodic payments as well as her right to distribute excess income from the annuity trust, as this authority was limited to the pendency of the annuity term. By reducing the annuity trust term decedent relinquished her power to distribute excess income to herself and her right to the full amount of periodic payments. Once she reduced the annuity trust term decedent no longer was entitled to invade the trust corpus or change the amounts of the distributions to the remaindermen.

**[*38]** Accordingly, decedent's action in reducing the annuity trust term constituted a relinquishment of her power with respect to her right to receive periodic payments and to distribute excess income from the transferred properties.

Value

Petitioner appears to contend that decedent retained an interest in only the portions of the transferred properties required to fund the periodic payments. In so contending petitioner relies primarily on Rev. Rul. 82-105, 1982-1 C.B. 133-- made obsolete as of July 14, 2008, by T.D. 9414, 2008-35 I.R.B. 454. Respondent contends that the full FMV of the Tierra Plaza and Black Walnut Square properties as of decedent's date of death is includible in decedent's gross estate.

If section 2036(a) applies, the decedent's gross estate includes the full FMV of the property transferred, determined as of the decedent's date of death. Fid.-Phila. Trust Co. v. Rothensies, 324 U.S. 108 (1945); see also sec. 20.2036-1(c), Estate Tax Regs. If the decedent retained an interest in or a right to all of the transferred property, the decedent's gross estate must include the value of the entire property. Sec. 20.2036-1(c)(1)(i), Estate Tax Regs. However, if the decedent retained an interest in or a right to only part of the transferred property, the decedent's gross estate must include only a corresponding portion of the property under section 2036. Id.

**[*39]**  In Rev. Rul. 82-105, <u>supra</u>, the Commissioner determined that a decedent who created a charitable remainder annuity trust had retained only the right to income from a portion of the transferred property.  Consequently, the decedent's gross estate was required to include the value of only the specific portion of the corpus that was necessary to produce the annuity payments.  <u>Id.</u>

In addition to her right to receive the periodic payments, decedent retained other interests in the transferred properties, including the right to control the properties, the right to distribute excess income from the properties, and the right to use such income to satisfy her personal loan obligations.  Rev. Rul. 82-105, <u>supra</u>, is inapplicable because decedent did not receive only the right to the periodic payments.

Decedent retained an interest in the entirety of the transferred properties and accordingly, decedent's gross estate includes the FMV of the Tierra Plaza and Black Walnut Square properties as of decedent's date of death.  The parties stipulated that the leased fee value of the Tierra Plaza and Black Walnut Square properties as of decedent's date of death was $4,300,000.  We reject petitioner's arguments in favor of a reduced FMV.  Accordingly, we conclude that the properties had an FMV as of decedent's date of death of $4,300,000 in accordance with the parties' stipulation.

**[*40]** <u>Residence Trust</u>

Petitioner does not dispute that decedent's gross estate must include a portion of the value of the Modesto property. However, petitioner contends, without persuasive reason or authority, that decedent's gross estate must include only an amount equal to the rental value of the Modesto property for the residence trust term. Respondent contends that decedent's gross estate must include the FMV of the Modesto property as of decedent's date of death.

Section 20.2036-1(c)(2)(i), Estate Tax Regs., provides that, in calculating the value of property includible in a decedent's gross estate:

> If a decedent transferred property into * * * [a retained annuity, unitrust, or other interest in any trust] and retained or reserved the right to use such property, or the right to an annuity, unitrust, or other interest in such trust with respect to the property decedent so transferred for decedent's life, any period not ascertainable without reference to the decedent's death, or for a period that does not in fact end before the decedent's death, then the decedent's right to use the property or the retained annuity, unitrust, or other interest * * * constitutes the retention of the possession or enjoyment of, or the right to the income from, the property for purposes of section 2036. The portion of the trust's corpus includible in the decedent's gross estate for Federal estate tax purposes is that portion of the trust corpus necessary to provide the decedent's retained use or retained annuity, unitrust, or other payment * * *

Accordingly, a decedent's gross estate includes the FMV of a residence if the decedent retained an interest in the residence for her life or for any other period

[*41] that does not end before the decedent's death.  See also sec. 2036(a); Estate of Disbrow v. Commissioner, T.C. Memo. 2006-34.

Decedent had the right to reside in and actually resided in the Modesto property until her death.  She retained possession and enjoyment of the Modesto property within the meaning of section 2036(a)(1).  See, e.g., Estate of Tehan v. Commissioner, T.C. Memo. 2005-128.  The entire Modesto property, rather than only its fair rental value, was necessary to provide decedent's retained use of the property.  Accordingly, decedent's gross estate must include the FMV of the Modesto property as of decedent's date of death.  See, e.g., Estate of Trotter v. Commissioner, T.C. Memo. 2001-250; Estate of Callahan v. Commissioner, T.C. Memo. 1981-357.

Mortgages Payable Deduction

Respondent concedes that decedent's estate is entitled to a deduction with respect to the Tierra Plaza mortgages because decedent personally was liable for those mortgages.  Respondent contends that decedent's estate is not entitled to a deduction for any mortgage with respect to the Black Walnut property because the record does not establish that decedent personally was liable for that mortgage.  However, respondent concedes that decedent's estate is entitled to offset the value of the Black Walnut Square property by the amount of the indebtedness secured by

**[*42]** that property. We infer from respondent's brief that the amount in dispute is attributable to the promissory note that the annuity trust issued to Helen Properties in 2001.

Amounts deductible as administration expenses are limited to those actually and necessarily incurred. Sec. 2053(a)(2); see sec. 20.2053-3(a) and (b)(1), Estate Tax Regs. The value of a decedent's gross estate shall be reduced by the amount of any "unpaid mortgages on, or any indebtedness in respect of, property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate". Sec. 2053(a)(4). Section 20.2053-7, Estate Tax Regs., provides:

> If the decedent's estate is liable for the amount of the mortgage or indebtedness, the full value of the property subject to the mortgage or indebtedness must be included as part of the value of the gross estate; the amount of the mortgage or indebtedness being in such case allowed as a deduction. But if the decedent's estate is not so liable, only the value of the equity of redemption (or the value of the property, less the mortgage or indebtedness) need be returned as part of the value of the gross estate. * * *

However, if the property was mortgaged after the decedent transferred a remainder interest, the decedent's estate is not entitled to a deduction for the full amount of the mortgage or the net equity of redemption value unless the decedent personally

**[*43]** was liable for the mortgage. Estate of Theis v. Commissioner, 81 T.C. 741, 750 (1983), aff'd, 770 F.2d 981 (11th Cir. 1985).

In December 2001 the annuity trust paid off the mortgage secured by the Black Walnut property and decedent was relieved of any personal liability with respect to that property. On December 15, 2001, decedent, on behalf of the annuity trust, issued a promissory note to Helen Properties, for which decedent personally was liable. The parties agree that the promissory note represented mortgage indebtedness secured by the Tierra Plaza and Black Walnut Square properties.

As discussed supra, the value of decedent's gross estate includes the FMV of the Tierra Plaza and Black Walnut Square properties as of decedent's date of death. Decedent personally was liable for the mortgage indebtedness identified by the promissory note. Accordingly, decedent's estate is entitled to deduct the full unpaid amount of the indebtedness attributable to the promissory note.

Charitable Contribution Deduction

Petitioner claims $250,000 as a charitable contribution deduction of decedent's estate. Respondent contends that decedent's gross estate is not entitled to a charitable contribution deduction because the residence trust term ended

**[*44]** before decedent's death and therefore decedent did not possess the right to direct the disposition of the Modesto property to a charitable organization.

Section 2055 provides a charitable contribution deduction for amounts transferred by a decedent for qualified charitable and religious uses. The transfers, however, must have been made during the decedent's lifetime or by will. Sec. 20.2055-1(a), Estate Tax Regs. Deductions are not permitted where the amounts passing to a charity turn on the actions of a personal representative. Estate of Engelman v. Commissioner, 121 T.C. 54, 70-71 (2003).

The residence trust agreement, both before and after amendment in August 2006, provided that if decedent was living at termination the trust property would be distributed equally to her children or their children, but if decedent was deceased at termination, the trustee would distribute the balance of the trust property as directed by decedent's will. The residence trust terminated before decedent's death pursuant to judicial reformation.

Decedent provided for the creation of the charitable remainder unitary trust in the amendment to her will. Because the residence trust terminated before decedent's death, however, the Modesto property should have been distributed equally to decedent's children or grandchildren rather than distributed as directed by decedent's will, i.e., in part to the charitable remainder unitary trust. The

**[*45]** amounts passing to the charitable organizations turned on the actions of M. Dole, who became trustee of the residence trust following termination of the trust term, rather than the actions of decedent during her lifetime or in her will. Therefore the estate is not entitled to any deduction for charitable contributions. See, e.g., id.

Conclusion

We have considered the parties' additional arguments, including some abandoned by the parties' failure to address them in the briefs. Certain of the issues suggested by the parties will be resolved on the stipulated facts by computations pursuant to Rule 155. To the extent other arguments are not discussed, we conclude that they are irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered under Rule 155.